PENGUIN INDUSTRIES, INC.,
Appellant,

v.

Glenn M. JUNGE et al., Appellees.

No. 6004.

Court of Civil Appeals of Texas,
Waco.

Oct. 31, 1979.

Rehearing Denied Nov. 29, 1979.

Rufus S. Garrett, Jr., Garrett, Settle & Callaway, Fort Worth, Turner, Turner & Turner, Cleburne, for appellant.

John R. MacLean, Cleburne, Tom R. Cofield, Jr., Dallas, John B. Murphrey and John O'Quinn, Riddle, Murphrey, O'Quinn & Cannon, Houston, for appellees.

## OPINION

JAMES, Justice.

This is a suit for personal injuries and damages arising out of an explosion at a munitions plant in Johnson County, Texas, on July 10, 1973. The Plaintiff-Appellees are injured employees who brought third party actions against Defendant-Appellant Penguin Industries, Inc., alleging, among other things, that Penguin negligently failed to design the crimping head mechanism used to crimp an explosive detonator to the body of a grenade fuse in such a manner that it would contain the explosion of a detonator. In other words, this is a products liability case that was tried in common law negligence rather than strict liability.

Penguin manufactured some equipment for its own use in assembling M–213 hand grenade fuses under a government contract. When Penguin ceased operations in this field, it sold all of its assembly-line equipment to Gearhart-Owens Industries, Inc., (hereinafter called "G–O"), in Cleburne, Texas. G–O obtained a similar government contract and began assembling hand grenade fuses at their Cleburne plant in March 1973.

The explosion of July 10, 1973, resulted in death to four G–O employees and injuries to approximately thirty other workers. The sixteen cases by Plaintiffs against Penguin were consolidated, and trial thereof was to a jury, which found:

(1) Penguin designed the crimping head mechanism that was in use at the Dorothy Cole position on the occasion in question.

(1A) Penguin failed to design the crimping head mechanism at the Dorothy Cole position in such a manner that it would contain the explosion of a detonator;

(2) that such failure was negligence;

(3) which failure was a proximate cause of the occurrence in question.

(4) Penguin designed the crimping head mechanism at the Dorothy Cole position in such a manner that it would not adequately and consistently perform the crimping operation and as a result could pinch a detonator.

(5) But the jury failed to find that the designing inquired about in No. 4 above was negligence.

(6) The jury did not answer Special Issue No. 6, a proximate cause issue based upon an affirmative answer to Special Issue No. 5.

(7) Glenn M. Junge struck a crimper head containing a detonator or inserted a wooden stick in the detonator.

(8) That such method used by Junge in attempting to remove the detonator from the crimping head was negligence.

(9) But the jury failed to find that such negligence of Junge was a proximate cause of the occurrence in question.

Special Issues 10 through 17 inclusive were damage issues concerning the various Plaintiffs. We will discuss only those damage findings which have been drawn in question by Defendant-Appellant's points of error. G–O's worker's compensation carrier intervened in the suit seeking reimbursements for the respective amounts paid the various Plaintiffs pursuant to such Plaintiffs' worker's compensation claims.

After jury verdict the trial court entered judgment in harmony therewith in favor of Plaintiffs against Defendant Penguin in the total amount of $899,821.14, from which Defendant Penguin appeals. We affirm.

Appellant assails the trial court's judgment upon six points of error, asserting: (1) there was no evidence of probative force to support the jury's finding that the failure of the crimper head to contain the explosion of the detonator was a proximate cause of the occurrence in question; (2) there was no pleading, proof, or jury issue that the crimping machinery was in essentially the same condition when it left Penguin's hands as it was at the time of the explosion; (3) the trial court erred in entering judgment for Plaintiffs because Penguin owed them no duty to furnish G–O an explosion proof crimper head; (4) that the trial court erred in entering judgments in favor of four of the Plaintiffs, to wit, Bocks, Benson, Cain, and Calhoun, because their suits were barred by the two year statute of limitations; (5) that there is no evidence to support the award of damages to the three adult children of Dorothy Cole for her death; and (6) there is no evidence to support the award of damages to the parents of Deborah Ann Spruell, an adult child, for her death. We overrule all of Appellant's points and contentions and affirm the trial court's judgment.

We revert to Appellant's first point, to wit, that there is no evidence to support the jury's finding that the failure of the crimper head to contain the explosion of the detonator was a proximate cause of the occurrence in question.

That part of the grenade assembly process pertinent to the case at bar consisted of crimping a detonator to the fuse assembly. The detonator is about five times as explosive as a blasting cap. The instrument used in this crimping process is called a "crimper head" or a "crimping head mechanism." The crimper heads were stationary devices positioned along and adjacent to the conveyor belt. Such mechanism is basically a cylindrical device made of steel, in which there was a round opening running lengthwise and vertically through the center of such mechanism. The opening was larger at the bottom of the head than at the top. The bottom of the opening was designed so that it housed a metal piston which moved up and down during the crimping process.

The fuse assembly is housed in a cast metal body, and consists mainly of a time fuse of slow-burning material, a priming cap, striker assembly, handle, safety pin and clip, to all of which assembly is attached a detonator. The detonator is a cylindrical container of explosive made of lightweight metal, three-eighths of an inch in diameter and one and seven-eighths inches in length, closed at one end and open at the other.

During the crimping process in question here, the operator would pick up a fuse assembly off the conveyor belt, pick up a detonator from a tray of detonators placed next to operator's station, manually slide the detonator upon and onto the lower portion of the fuse assembly, place the fuse assembly and attached detonator in the smaller opening at the top of the crimper head mechanism; whereupon the operator pressed the safety switch and then stepped upon a foot pedal which in turn raised and activated the piston which thereby crimped the detonator to the fuse assembly. Although the outside of the crimper head was basically round and cylindrical, part of this outside surface had been milled down flat so that a safety switch could be positioned on this outside face.

On the G–O assembly line there were a total of eight such crimping heads, mounted four on each side of a table. A conveyor belt ran down the middle of the table between the crimper heads, with four on each side. A box or tray of detonators was

located on the table next to each crimper head mechanism. Each such box or tray would hold about 100 to 110 detonators. One operator was employed to operate each of the eight crimper heads.

The fuse assemblies came down the conveyor belt to the crimping station, whereupon the following procedure was accomplished by the crimping operator: (1) pick up the fuse assembly from the conveyor belt; (2) pick up a detonator out of the box beside the crimper head; (3) place the detonator on the fuse assembly; (4) place the entire unit into the crimper head through the opening in the top of the crimper head mechanism; (5) press the safety switch (located on the flat side of the crimper head) to permit the foot pedal to be engaged; (6) engage the foot pedal which released air pressure that caused the piston inside the crimper head to move upward and press against a plastic washer which crimped the detonator to the fuse assembly. The assembled fuse with attached detonator was then moved from the head, placed upon the conveyor belt, whereupon the process was ready to be repeated.

Plaintiffs contended that the explosion was initiated by the pinching of a detonator in the crimping machine operated by Mrs. Dorothy Cole, and that sparks or fire from that initial explosion ignited boxes of detonators in close proximity to the workers. To the contrary, the Defendant contended that the probable cause of the explosion was the alleged negligence of Plaintiff Glenn Junge by supposedly tapping a crimper head (which he was holding in his left hand at the time of the explosion), in order to remove the detonator hung inside of the crimper head. It was undisputed that hung detonators were a routine problem, and normally they were not hard to remove or get out of the crimper head. Junge and Mrs. Cole operated stations across the table from each other. Junge testified that he did not recall ever striking the crimper head which he had detached and was holding in his left hand at the time of the explosion; and there is no evidence that Junge actually struck the crimper head. Although at the time of the explosion Junge was holding the detached crimper head in his left hand, his right hand and arm sustained the more serious injuries. The deaths occurred on Mrs. Cole's side of the table, not on Mr. Junge's side. Mrs. Cole's crimper head exploded internally and amputated all of the fingers on her right hand. If the primary explosion had occurred at Junge's station, Mrs. Cole would have been blown from the assembly table prior to any secondary explosion; whereas, as it was, she had no reaction time. Expert testimony established that the initial explosion occurred inside her crimping head mechanism, due to the pinching of a detonator, and the fact that the fingers of her right hand were amputated corroborates the expert opinions to this effect. Mrs. Cole was right handed. Expert testimony showed that Penguin's failure to manufacture the crimper head mechanism (located at Mrs. Cole's station) in such a way that it would contain an internal explosion, caused an explosion resulting in deaths and serious bodily injuries for which the trial court correctly entered judgment for damages.

Neither of the two living eyewitnesses could positively identify the primary cause of the explosion. Mrs. Ola Mae Thomas remembered nothing of the explosion. Mr. Junge testified that he remembered seeing only a flash between his station and that of Mrs. Cole, and could not say whether the flash started from his direction toward Mrs. Cole, or from her direction towards him.

To locate a ring reportedly on Mrs. Cole's right hand at the time of her death, Johnson County Memorial Hospital took X-rays of her right hand. The X-ray showed that the fingers of her right hand were amputated between the finger joints and that the right thumb joint was dislocated. The hand tissue was shredded up. Her lower jaw was broken. Dr. Arthur L. Raines, a medical doctor and County Health Officer, testified that, based on his study of numerous exhibits, he believed Mrs. Cole's hand was on the crimper head when it blew up. Had the initial explosion occurred anywhere but within her crimping head, it would have blown her away from the table before an

explosion could amputate her fingers. Dr. Raines also testified that because Junge's left hand held a hung detonator in a crimper head and his right hand and side sustained the greater injury, his crimper head did not explode while Junge's hand was on it.

The crimper head mechanisms were purchased by G–O from Penguin, and were reassembled without alteration, according to the undisputed testimony of Mr. C. D. Barnett, a maintenance man for G–O who was active in the moving of the equipment from Penguin's plant in Pennsylvania to G–O's plant at Cleburne, Texas, and the setting up of such equipment at the Cleburne plant.

Mr. Austin M. Wortley, Chairman of the Board for Penguin, testified that these crimper heads were supposed to be designed so that they would contain an internal explosion, because if they did not they would not only injure the operator but would also set off secondary explosions.

Approximately half of the top 60% of Mrs. Cole's crimper head blew apart from the remainder of the said mechanism. A casual inspection of this mechanism shows that it had blown out from an internal explosion. The crimper head which Junge was holding in his left hand was also blown out from the inside.

George Greene, a consulting mechanical engineer, concurred with Dr. Raines's opinion that the initial explosion occurred in Mrs. Cole's crimper head and that it was set off from and by internal sources.

Testimony was undisputed that an explosion of the detonator can be brought about by alteration of the detonator case, and there is considerable evidence showing the problems that occurred causing crunching or pinching of the detonator case. Regardless of the actual crimping process being used, it is foreseeable that when the detonator is being attached to the fuse body, there is the possibility of an explosion, and that without a design that will contain the explosion, people will be injured. Moreover, when dealing with an extremely high explosive as this, the standard of care required to prevent injury to the persons operating the equipment is much higher. Mr. Wortley, Penguin's Board Chairman, foresaw that a crimper head unable to contain an internal explosion would cause injuries upon detonation.

There is ample evidence to show that Penguin breached its duty to exercise ordinary care to design and produce a crimper head mechanism capable of containing an internal explosion, and that the crimper head at Mrs. Cole's position was designed and manufactured by Penguin.

■ Appellant contends that there is no evidence of probative value to support the jury's finding that the failure of the crimper head to contain the explosion of a detonator was a proximate cause of the explosion in question; that the evidence presents merely surmise and conjecture, and presumptions based upon presumptions. We do not agree. The evidence not only presented physical facts such as recounting of events before and after the explosion by surviving eyewitnesses, personal examination of the victims, X-rays of the victims, analysis of the two exploded crimper head mechanisms, but also the expert opinions of Dr. Raines and Mr. Greene as to how and where the explosion started and commenced. Both of these experts testified that in their respective opinions the explosion first took place inside Mrs. Cole's crimper head. Mr. Greene was further of the opinion that such explosion was caused by the crushing of the detonator assembly during the crimping operations. In our opinion, this evidence is not only legally sufficient but ample to support the jury's finding of proximate cause in question. See *Gulf, C. & S.F. Ry. Co. v. Downs* (Dallas, Tex.Civ.App. 1934) 70 S.W.2d 318, writ refused; *Phoenix Refining Co. v. Powell* (San Antonio, Tex.Civ.App. 1952) 251 S.W.2d 892, NRE; *Kettle v. Smircich* (Corpus Christi, Tex.Civ.App. 1967) 415 S.W.2d 935, no writ; Vol. 2, McCormick & Ray, Texas Law of Evidence, Section 1395, page 220. Appellant's Points 1, 2, and 3 are overruled.

Appellant's Point No. 4 asserts that judgment was improperly rendered in four of the consolidated cases, since the claims of Plaintiffs Bocks, Benson, Cain and Calhoun were barred by the two-year statute of limitations, Art. 5526, Vernon's Texas Civil Statutes.

The Plaintiffs' causes of action were based on injuries sustained on July 10, 1973, and suits of Bocks, Benson, and Cain were not filed until February 2, 1977. The Plaintiff Calhoun did not file suit until February 11, 1977. However, the injuries sustained in the explosion of July 10, 1973 were injuries compensable under the Worker's Compensation Act and these four Plaintiffs did in fact successfully prosecute compensation actions. The respective dates of these four Plaintiffs' worker's compensation settlements were as follows: Cain, January 7, 1976; Bocks, January 9, 1976; Benson, January 26, 1976; and Calhoun, July 26, 1976.

At the time of the injuries, (July 10, 1973) under the terms of Art. 8307, Sec. 6a, Vernon's Texas Civil Statutes, prosecution of a worker's compensation claim had the effect of tolling the statute of limitations on third party actions. An employee was required to assert his compensation claim before proceeding against a third party, or otherwise he waived his worker's compensation claim. *Watson v. Glens Falls Insurance Co.* (Tex. 1974), 505 S.W.2d 793. As a corollary to this requirement, the statute of limitations on the third party action did not begin to run until the compensation claim was settled or a final judgment was obtained against the carrier. *Campbell v. Sonford Chemical Co.* (Tex.1972), 486 S.W.2d 932.

■ Effective September 1, 1973, an amendment to Art. 8307, Sec. 6a specifically eliminated the requirement that an injured employee proceed against the compensation carrier before asserting a third party action. Thus, the filing of a worker's compensation claim no longer tolls the running of the statute of limitations and the third party action is simply governed by the general statute of limitations, Article 5526, V.T.C.S. The question presented by Appellant is whether the running of the statute of limitations in these four causes was governed by Art. 8307, Sec. 6a, as it existed before or after the amendment effective September 1, 1973. The Appellant argues that the statute of limitations on these Plaintiffs' claims should have begun to run on September 1, 1973 when the impediment to third party claims was removed by amendment.

This precise question was presented to the Dallas Court of Civil Appeals in *Robinson v. Buckner Park, Inc.* (Dallas, Tex.Civ. App. 1977), 547 S.W.2d 60, NRE, and to the Ft. Worth Court of Civil Appeals in *Potter v. Crump* (Ft. Worth, Tex.Civ.App. 1977), 555 S.W.2d 206, NRE. Both courts held that, when the cause of action arose prior to September 1, 1973, the claimant's right to bring a third party action would be governed by Art. 8307, Sec. 6a as it existed prior to amendment. Further, the statute of limitations would be tolled for third party actions during the prosecution of the compensation claim per *Campbell v. Sonford Chemical Co.*, supra. We agree with *Robinson*, supra and *Potter*, supra.

■ At the same time that the Legislature amended Art. 8307, Sec. 6a, it also passed Art. 8309, Sec. 3b which provided that no right or remedy "shall be in any way affected by any of the amendments herein made to the original law hereby amended, but all rights, remedies, . . . shall remain and be in force as under the original law just as if the amendments hereby adopted had never been made . . ." This provision in our opinion clearly provides that the Legislature intended that the amendment to Art. 8307, Sec. 6a have prospective application only. Appellant vigorously argued that no "rights" would be affected if the statute of limitations began running for existing third party actions on September 1, 1973, the effective date of the legislation. Appellant, however, overlooks the fact that if these Plaintiffs had filed a third party action prior to the adjudication of their compensation claims, the compensation carrier would surely have claimed that such Plaintiffs had waived their right to worker's compensation, citing the pre-

amendment version of Art. 8307, Sec. 6a. Clearly, the carrier would have had the "right" under the pre-amendment law to avoid an award under such circumstances. In this connection, our Supreme Court in *Watson v. Glens Falls Ins. Co.* (Tex.1974), 505 S.W.2d 793 at page 795 says: ". . . the function of Section 6a is to protect *both* the injured workman's right to a recovery from a negligent third party and the carrier's right to recoup funds paid in response to a workmen's compensation claim from the same negligent third party." We feel that the Legislature in drafting Art. 8309, Sec. 3b was referring to the "rights" of *all* parties affected by the worker's compensation provisions and not just the "rights" of injured claimants. Thus, we agree with *Robinson,* supra and *Potter,* supra, and hold that Art. 8307, Sec. 6a should have prospective application only and overrule Appellant's point number four.

In Appellant's fifth and sixth points, respectively, Appellant asserts that there was no evidence of probative force to support an award in wrongful death of damages to the three adult children of Dorothy Cole or to support an award of damages to the parents of an adult child Deborah Ann Spruell. Because of the similarity of the law applicable to recovery for death of a parent by adult children and the law pertinent to recovery of damages by parents for the death of an adult child, these two points will be considered jointly.

▇ First of all, it has been long settled that damages awarded to beneficiaries in wrongful death actions must be based on actual pecuniary losses. Damages by reason of grief, mental anguish, bereavement, and loss of companionship are not recoverable. *McGown v. International & G. N. R. Co.* (1892), 85 Tex. 289, 20 S.W. 80. At the same time, it has been equally well-settled that "pecuniary" losses may include the loss of services or labor or the loss of other things which may have monetary value. *McGown v. International & G. N. R. Co.,* cited supra; *San Antonio & A.P. Ry., Co. v. Long* (1894), 87 Tex. 148, 27 S.W. 113; *Missouri, K & T Ry. Co. of Texas v. Butts*

(1910), 62 Tex.Civ.App. 539, 132 S.W. 88, writ ref'd.

▇ Dorothy Cole's three children were awarded damages of $7500 each. There was admittedly little evidence that Dorothy Cole assisted her children with direct monetary support. Diane Leck, Cole's only daughter did testify that her mother paid her $10 a week to drive her to work and back. However, all three children testified that Mrs. Cole generously performed services of actual monetary value. David Cole testified that his mother provided babysitting and nursing services for his wife and children when his wife had a baby and that she continued to babysit at least once a month. He testified that his mother would stay with his family whenever they needed help. He further testified that his mother helped him tear down an old house to salvage its lumber and that she also assisted in the construction of his new home. He also testified that she also made clothes for his children. Diane Leck also testified that Mrs. Cole took care of her house and family when Diane was in the hospital and that Mrs. Cole babysat regularly for her. James Cole also testified that Mrs. Cole worked for his family whenever he needed her. He, like his brother, testified that Mrs. Cole had also assisted him in salvaging lumber from an old house for use in the construction of his new home. All three children testified of their mother's industriousness and financial independence. Although the children had assisted her financially in a one-time legal fee incident to a divorce, she was regularly and gainfully employed and otherwise took care of herself. This testimony, being uncontroverted, is legally sufficient to establish the pecuniary interest of these three children in the life of their mother, and to support the award of money damages for the wrongful death of Dorothy Cole.

▇ Joann Spruell and Ellis Harrington Spruell received damages of $5000 each for the losses suffered as a result of the death of their eighteen-year-old daughter. Testimony established that Debbie Spruell had been a very industrious child. She was a good student in high school and had just finished her freshman year in college,

where she had majored in social work, in anticipation of becoming a social worker. She had worked the summer after her high school graduation and was working during the summer of 1973 in order to assist in the expenses of her education. She also assisted in household duties of cleaning and cooking while she was at home. Testimony further established that Debbie had a good relationship with both parents. Both parents testified that they sought and listened to her advice. Her mother testified that Debbie was a very mature young girl and that she (her mother) already depended on her advice and guidance in problems that would develop from time to time. Courts have recognized that "[a]t best, the deceased child's probable contributions to his parent can be shown only imperfectly." *Missouri-Kansas-Texas Railroad Company v. Pierce* (Austin, Tex.Civ.App. 1975), 519 S.W.2d 157, 159, NRE. This evidence, though "imperfect" in some respects, is legally sufficient to support the award of money damages to the parents of Debbie Spruell.

We therefore overrule Appellant's Points Five and Six.

Having carefully considered all points raised on appeal and finding no reversible error in the record, we affirm the judgment of the trial court.

AFFIRMED.