JOHN DEERE COMPANY, et
al., Appellants,

v.

Jacklyn MAY, Individually and as Repre-
sentative of the Estate of Robert May
and as Next Friend of Teresa May, a
minor, Appellee.

No. 10–88–140–CV.

Court of Appeals of Texas,
Waco.

May 18, 1989.

Rehearing Denied June 15, 1989.

Susan E. Crowley, Hays, McConn, Price & Pickering, Robert D. Green, Law Offices of Robert D. Green, Houston, for appellants.

Ernest H. Cannon, Ernest Cannon & Associates, Houston, Roger Knight, Jr., Roger Knight, Jr., Inc., Madisonville, for appellee.

## OPINION

THOMAS, Chief Justice.

Robert May was killed in August 1984 when a John Deere 450C bulldozer backed over him. His wife and minor daughter filed a product-liability and wrongful-death suit against John Deere and its local distributor, Hyco Equipment, and recovered a $2,652,000 judgment for actual and exemplary damages. Points on appeal relate to the admissibility of other incidents involving John Deere dozers and the evidentiary support for certain liability findings, exemplary damages, and actual damages recovered by May's minor daughter for past and future pecuniary loss. The judgment will be affirmed.

No one knew how May was killed because there were no witnesses to the accident. The plaintiffs' theory was that May had stopped the dozer, left it in neutral with the engine running, and then kneeled down behind it to check for a hydraulic leak. They contended the dozer backed over him when it shifted itself from neutral into reverse. John Deere suggested that May inadvertently shifted the transmission from neutral to reverse while he was under the dozer attempting to reconnect a broken shift lever to the transmission assembly.

John Deere knew as early as 1971 that its dozers would shift into gear if they were left in neutral with the engine running. It tried to correct the problem in 1972 by redesigning the "spool valve" in the transmission assembly and by notifying dealers and users of its dozers that the transmission linkage should be inspected and adjusted after every 1,000 hours of operation. However, over the years John Deere continued to receive reports of similar occurrences. In 1981 an attorney in Washington state sent the company a videotape (the "Nelson videotape") showing a dozer shifting from neutral into reverse even though its gear-shift lever was locked in neutral. During discovery John Deere furnished the plaintiffs a list of thirty-four incidents, all occurring prior to May's death, in which model 2010 or 450C dozers allegedly shifted into gear after they were left in neutral with the engine running. Among the thirty-four incidents were the occurrence depicted in the Nelson videotape and an incident the parties referred to as "Reed v. John Deere."

In 1983 John Deere's Product Safety Review Board recommended that all model 2010, 450, 450B and 450C dozers be "retrofitted" with another redesigned spool valve and a neutral gear on the dozers' second transmission.[1] The company initiated the safety modification program in May 1983, fifteen months before May's death.

The court allowed the plaintiffs to show the Nelson videotape to the jury and to question Robert Tunstall, a John Deere executive, about the thirty-four incidents. Tunstall was not questioned about the details of the thirty-four incidents, but about the number of incidents. Finally, the court permitted the plaintiffs to cross-examine him by using some of the facts in *Reed v. John Deere*, a product-liability suit involving a 450B dozer which self-shifted from neutral into reverse. See *Reed v. John Deere*, 569 F.Supp. 371 (M.D.La.1983).

John Deere and Hyco contend these extraneous incidents were improperly admitted because the plaintiffs failed to prove that they occurred under circumstances substantially similar to May's accident. Essentially, they argue that May's dozer and the dozers in the other incidents had to be the same models, similarly adjusted, and have similar wear and tear on their transmissions before the circumstances could be reasonably similar. Furthermore, they contend the court should have excluded the other occurrences because, assuming they were relevant, their relevance was substantially outweighed by the danger of unfair prejudice resulting from their admission. *See* Tex.R.Civ.Evid. 403.

## EXTRANEOUS INCIDENTS

■ Extraneous incidents may be admissible if they and the accident involved in the suit occurred under "reasonably similar but not necessarily identical circumstances." *Missouri–K.–T.R. Co. v. May*, 600 S.W.2d 755, 756 (Tex.1980). They can be relevant to a number of determinative issues in a product-liability suit. *See Firestone Tire & Rubber Co. v. Battle*, 745 S.W.2d 909, 912 (Tex.App.–Houston [1st Dist.] 1988, writ den.) (admissible to prove the manufacturer knew the dangerous nature of a product, to evaluate the magnitude of the danger, to determine the adequacy of a warning, and to prove conscious indifference to a known danger); *Rego Co. v. Brannon*, 682 S.W.2d 677, 682 (Tex. App.–Houston [1st Dist.] 1984, writ ref'd n.r.e.) (admissible to prove notice of prior or continuing problems with a product); *McInnes v. Yamaha Motor Corp., U.S.A.*, 659 S.W.2d 704, 710 (Tex.App.–Corpus Christi 1983), *aff'd on other grounds*, 673 S.W.2d 185 (Tex.1984) (admissible to prove that a product is dangerous and a producing cause of an injury); *Rush v. Bucyrus–Erie Co.*, 646 S.W.2d 298, 302 (Tex.App.–Tyler 1983, writ ref'd n.r.e.) (admissible to prove defective design, failure to warn, and negligence); *Air Shields, Inc. v. Spears*, 590 S.W.2d 574, 579 (Tex.Civ.App.–Waco, 1979, writ ref'd n.r.e.) (admissible to prove notice); *Magic Chef, Inc. v. Sibley*, 546 S.W.2d 851, 855 (Tex.Civ.App.–San Antonio 1977, writ ref'd n.r.e.) (admissible to prove a design defect).

What constitutes reasonably similar circumstances under the facts presented? John Deere's and Hyco's argument, that the dozers had to be reasonably similar before there could be a reasonable similarity of circumstances, is rejected because that would have required proof of identical circumstances. Identical circumstances are not required. *May*, 600 S.W.2d at 756. May's death and the other incidents occurred under reasonably similar circumstances if they involved *the same type of occurrence*, i.e., the circumstances would be reasonably similar if the dozers moved

---

**1.** These dozers were apparently equipped with an "HLR" transmission and a "range" transmission. The HLR transmission allowed the operator to leave the dozer in neutral gear or change from forward to reverse (or vice versa) without using a clutch. The range transmission controlled the dozer's speed in forward or reverse. Although designed for a neutral gear, the range transmission could not be used for neutral because its selector plate did not have a "detent" (notch) for such a gear setting. The safety modification program involved cutting a ·notch in the selector plate which would allow the range transmission to be used to place the dozer in neutral gear.

after being left in neutral with the engine running. *See Rush,* 646 S.W.2d at 301.

A defense witness admitted that the Nelson videotape showed a dozer moving even though its gear-shift lever was locked in neutral. The incident in *Reed v. John Deere* also involved a 450B dozer which moved after it had been left in neutral with the engine running. Furthermore, John Deere admitted that the thirty-four incidents, which included the Nelson incident and the incident in *Reed v. John Deere,* all involved dozers which allegedly moved after being left in neutral with the engine running. The circumstances surrounding May's death and the extraneous incidents were reasonably similar because they all involved the same type of occurrence.

■ Strict liability for an unreasonably dangerous product does not depend upon what the manufacturer knew or should have known. *General Motors Corp. v. Hopkins,* 548 S.W.2d 344, 351 (Tex.1977). However, what the manufacturer knew or should have known is relevant to the defense of unforeseeable misuse and in determining whether the manufacturer had a duty to warn of potential danger from the product's use. *Id.; Bristol–Myers Co. v. Gonzales,* 561 S.W.2d 801, 804 (Tex.1978). Likewise, whether a manufacturer acted with conscious indifference in the face of a known danger is relevant to his liability for exemplary damages. *Battle,* 745 S.W.2d at 912.

The plaintiffs alleged that John Deere knew its dozers were unreasonably dangerous, that it acted with conscious indifference to the known danger, and that it failed to give May an adequate warning of the known danger. Unforeseeable misuse was pled as a defense. These issues turned on what John Deere knew or should have known. Evidence is relevant if it has any tendency to make the existence of any determinative fact more or less probable than it would otherwise be without the evidence. Tex.R.Civ.Evid. 401. The extraneous incidents, being probative of what John Deere knew or should have known, were relevant to determinative issues involving notice. *See Battle,* 745 S.W.2d at 912. Further-

more, they were relevant to issues on producing cause and defective design. *See McInnes,* 659 S.W.2d at 710; *Rush,* 646 S.W.2d at 302; *Magic Chef, Inc.,* 546 S.W.2d at 855.

Determining that the extraneous occurrences were relevant does not automatically guarantee their admissibility. Rule 403 of the Rules of Civil Evidence provides that the court *may* exclude relevant evidence if its probative value is "substantially outweighed" by the danger of unfair prejudice that would result from its admission. Tex. R.Civ.Evid. 403. This requires the trial court to apply a "balancing test." *Perez v. Baker Packers,* 694 S.W.2d 138, 140 (Tex. App.–Houston [14th Dist.] 1985, writ ref'd n.r.e.). John Deere and Hyco argue that the court should have excluded the extraneous occurrences, even if relevant, because the danger of unfair prejudice substantially outweighed their relevance.

No one witnessed May's death and the parties had different theories about what caused it. Lacking direct evidence, the plaintiffs were forced to rely primarily on circumstantial evidence to prove that John Deere dozers had a propensity to self-shift from neutral into reverse and that this dangerous propensity had caused May's death. One cannot prove a propensity by proving a single occurrence. If the plaintiffs could prove John Deere knew or should have known that its dozers had a propensity to act this way, then the company had a duty to warn May of the danger. The extent and adequacy of the warning would be affected by the degree of danger to May: a greater propensity to self-shift, resulting in greater danger to May, would require a more imperative and urgent warning. Furthermore, they could recover exemplary damages if they proved that John Deere knew of the greater danger but acted with conscious indifference.

What type of evidence was more vital to the plaintiffs' case, and thus more relevant and probative, than proof that John Deere dozers had self-shifted on numerous other occasions and that the company knew of this dangerous propensity? In fact, the relevance of such proof would be corre-

spondingly heightened by proving the largest number of extraneous incidents possible. Proving one-hundred other occurrences, rather than thirty-four, only would have increased the probability that May's death occurred as the plaintiffs alleged. Accordingly, the court could have reasonably concluded that the relevance of such proof was extraordinarily high.

Every plaintiff tries to introduce evidence that will support his case and harm or prejudice that of the defendant. Extraneous incidents, which are commonly admitted as relevant evidence in product-liability cases, can be extremely harmful to the defense. However, evidence cannot be excluded just because it may prejudice the opposing party before the fact-finder. *Hussmann v. Leavell & Sherman*, 20 S.W.2d 829, 832 (Tex.Civ.App.–El Paso 1929), *aff'd*, 32 S.W.2d 643 (Tex.Comm'n App.1930, judgmt adopted). This is because Rule 403 recognizes that evidence can result in fair or unfair harm. *See* Tex.R.Civ.Evid. 403. Thus, evidence must not only create a danger of *unfair* prejudice, but such danger must substantially outweigh its relevance before it can be excluded. Other incidents may be excluded only if their relevance is substantially outweighed by the "danger of unfair prejudice." *See id.*

John Deere and Hyco contend the court should not have allowed the plaintiffs to cross-examine Robert Tunstall about the facts or findings in *Reed v. John Deere.*[2] Tunstall was responsible for informing dealers and owners about the modification program. The court allowed the plaintiffs to make veiled references to the facts and findings in the *Reed* opinion when they cross-examined Tunstall about his knowledge of an extraneous incident in which a person was killed when a model 450B dozer backed over him. However, the court refused to admit the *Reed* opinion as a jury exhibit or allow the plaintiffs to refer to

the *Reed* suit by name or disclose who won or the amount of damages awarded in that suit. Tunstall denied knowing anything about the unnamed suit. The thrust of the questions was to determine whether, if Tunstall had known that "a court" had found in June 1983 that the dozer was defectively designed and manufactured, such knowledge would have affected the modification program or his or the company's efforts in notifying May of the danger. The court told the jury that it could not consider references to the unidentified extraneous occurrence in determining whether May's dozer was defective, but could only consider such references on the issue of notice and their possible effect on the efforts to implement the modification program.

■ John Deere and Hyco claim they were unfairly prejudiced by references to the opinion or judgment in *Reed* because the parties to both suits were not identical. Ordinarily, unless the parties and issues are identical, a judgment, verdict or decree is not admissible to prove a contested issue in another proceeding or to establish the facts on which the judgment, verdict or decree was rendered. *See M'Camant v. Roberts*, 66 Tex. 260, 1 S.W. 260, 261 (1886); *Allen v. Great Liberty Life Insurance Company*, 522 S.W.2d 247, 250–51 (Tex.Civ.App.–Eastland 1975, writ ref'd n.r.e.) (quoting *Davis v. Zapata Petroleum Corporation*, 351 S.W.2d 916, 922 (Tex.Cir. App.–El Paso 1961, writ ref'd n.r.e.)). This rule was inapplicable because the opinion and judgment in *Reed* were never admitted as a jury exhibit.

As mentioned above, the *Reed* incident and May's death occurred under reasonably similar circumstances because they involved the same type of occurrence. The limiting instruction, restricting the jury's consideration of the extraneous incident to notice and admonishing the jury not to consider it as evidence of a defect in May's

---

**2.** Charles Reed was killed in 1980 when a model 450B dozer backed over him after it was left in neutral with the engine running. The court found in a bench trial that Reed's dozer was defectively designed, was defective when it left the factory, and that John Deere failed to adequately warn Reed of the danger. The trial court's written opinion in *Reed v. John Deere* was issued on June 28, 1983, fourteen months before May's death. *See Reed v. John Deere*, 569 F.Supp. 371 (M.D.La.1983).

dozer, effectively removed or substantially diluted whatever unfair prejudice that could have flowed from the abstract and indefinite references to findings in the *Reed* opinion.

■ The court had to balance the relevance of each extraneous incident with the danger of unfair prejudice that could result from its admission. *See Perez*, 694 S.W.2d at 140. It gave a limiting instruction each time evidence of the extraneous incidents was admitted. The instructions not only restricted the jury's consideration of such evidence to the issue of notice, one of the determinative issues in the case, but admonished the jury that it could not consider the extraneous incidents as evidence that May's dozer was defective. The limiting instructions undoubtedly diluted whatever prejudicial effect the extraneous occurrences may have had on the defense.[3] Considering the record as a whole, the court did not abuse its discretion when it admitted evidence of the extraneous incidents. The first two points and points five through eight are overruled.

After the court allowed the plaintiffs to use the facts in *Reed v. John Deere* to cross-examine Tunstall, John Deere tried to question another of its witnesses about a favorable take-nothing judgment in an incident the parties referred to as *"Ellingson v. John Deere."* However, the court refused to allow questioning about the *Ellingson* suit, and excluded the take-nothing judgment as a jury exhibit. The *Ellingson* incident was included in the thirty-four occurrences revealed by John Deere during discovery.

John Deere and Hyco present two arguments under the third and fourth points. First, they argue, if the opinion in *Reed* put the company on notice that its dozers were defectively designed and manufactured, then the take-nothing judgment in *Ellingson* was admissible as "favorable" notice that its dozers were not defectively designed or manufactured. Second, they argue that the favorable take-nothing judgment in *Ellingson* was admissible to mitigate the unfair prejudice which resulted from admitting the unfavorable findings in *Reed.*

■ The court ruled correctly when it excluded the *Ellingson* judgment as an exhibit. *See M'Camant*, 1 S.W. at 261 (holding a judgment, verdict or decree is not admissible to prove a contested issue in another proceeding or to establish the facts on which the judgment, verdict or decree was rendered, unless the parties and issues of both proceedings are identical). Rulings relating to the *Reed* opinion and the *Ellingson* judgment were consistent because both were excluded as jury exhibits. Point three is overruled.

May's death and the extraneous incident in *Ellingson* occurred under reasonably similar circumstances because they both involved dozers which allegedly moved after they were left in neutral with the engine running. The *Ellingson* judgment was not admissible. However, assuming the court erred when it refused to allow questions about the *Ellingson* incident, the question is whether that refusal resulted in reversible error.

■ An error is harmless unless it probably results in an improper judgment. Tex.R.App.P. 81(b)(1). Furthermore, reversible error does not result from evidentiary rulings unless the whole case turns on the admission or exclusion of the evidence. *Turner v. Monsanto Co.*, 717 S.W.2d 378, 381 (Tex.App.–Houston [14th Dist.] 1986, writ ref'd n.r.e.). Did the whole case turn on the exclusion of the evidence? Would John Deere and Hyco have received a more favorable verdict if the court had allowed their witness to be questioned about the underlying facts in *Ellingson?* To hold that John Deere and Hyco would have received a more favorable verdict, if the jury had only known the underlying facts of another allegedly similar occurrence, is incredulous under the

---

3. Considering the cases in which extraneous occurrences were admitted to prove defective design and producing cause, one could argue that the court unduly restricted the jury's considera-tion of such evidence to notice. *See McInnes*, 659 S.W.2d at 710; *Rush*, 646 S.W.2d at 302; *Magic Chef, Inc.*, 546 S.W.2d at 855.

record. One cannot reasonably say that exclusion of the evidence probably resulted in an improper judgment. Point four is overruled.

Dr. Walter Reed, the plaintiffs' expert, made a videotape in June 1986 of May's dozer self-shifting into gear while it was unattended with its engine running. The dozer was then owned by Milton Sims, who had spent $2,000 having its transmission modified. The court, noting that the videotape merely depicted what Dr. Reed had already described in his video deposition, admitted the videotape over an objection that it was an out-of-court experiment conducted without the defense's experts being present.

■ Error resulting from the admission of evidence is waived by allowing similar evidence to be admitted without objection. *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex.1984). John Deere and Hyco waived any error when they previously allowed Dr. Reed to testify, without objection, to facts depicted on the videotape. The ninth and tenth points are overruled.

## HYCO'S LIABILITY AND EXEMPLARY DAMAGES

The jury found that Hyco was negligent and grossly negligent in the "recall" of May's dozer, that its negligence was a proximate cause of May's death, and the jury assessed fifteen percent of the actual damages and $550,000 in exemplary damages against Hyco. Hyco questions in points eleven through fourteen whether the negligence and proximate-cause findings are supported by legally and factually sufficient evidence.

A no-evidence point is decided by considering only the evidence and inferences which tend to support a challenged finding, as all contrary evidence and inferences must be ignored. *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 593 (Tex. 1986). However, a point attacking the factual sufficiency of the evidence must be decided by considering all evidence and inferences, favorable and unfavorable, relating to the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

Ignoring evidence and inferences to the contrary, the following supports the findings of negligence and proximate cause against Hyco. Robert Tunstall, who was responsible for notifying dealers and owners about the modification program, described how the program was implemented. In May 1983 John Deere used first-class mail to notify dozer owners about the program, and supplied its dealers with modification kits and a list of owners in their trade areas whose dozers needed modification. The company's field representatives contacted dealers, gave them instructions, "red tagged" their files, assisted the dealers in contacting owners, and generally monitored the program's progress. A dealer notified John Deere every time a dozer was modified, and each month the company sent its field representative and the dealer an updated list of owners whose dozers had not yet been modified. May's name and correct mailing address appeared on Hyco's list of owners, and continued to appear on Hyco's monthly reports of owners with unmodified dozers.

Tunstall admitted that Hyco knew May's dozer had not been modified, and that Hyco should have contacted May about bringing in his dozer for modification. However, Hyco failed to produce any specific evidence that May had received the original 1983 notice letter, that he had been otherwise contacted by John Deere, or that Hyco had contacted or even tried to contact him. Furthermore, Hyco did not produce May's file or call John Deere's field representative or any of its own officers and employees as witnesses.[4]

Hyco essentially argues that the evidence conclusively proved May was aware of and had been warned of the danger. Bob Routzong, who worked for May as a dozer operator, testified for the defense. He said May told him in 1983 that, although he did not have the "bulletin," he had "heard that there was the possibility [the dozer] could jump into gear while the engine was running." Routzong said other

---

4. Hyco was apparently in bankruptcy during the trial.

dozer operators had also told him this. Routzong's testimony was not binding on the jury. In fact, the jury could have reasonably disbelieved the portion of his testimony relating to May's knowledge, especially after Routzong admitted that he had been an insurance adjuster for twenty-five years and had never before disclosed that particular testimony.

Failing to produce evidence within its control or to call its own officers and employees or John Deere's field representative raised a presumption or inference that such evidence and testimony, if produced, would have been unfavorable to Hyco on the challenged findings. *See Edwards v. Shell Oil Co.,* 611 S.W.2d 904, 907 (Tex.Civ.App.–Eastland 1981, writ ref'd n.r.e.) (holding a party who fails to produce evidence under his control raises a presumption that such evidence, if produced, would have been adverse to him); *Texas Power & Light Co. v. Walker,* 559 S.W.2d 403, 406 (Tex.Civ.App.–Texarkana 1977, no writ) (holding unfavorable inferences may be drawn from the failure of a party to call witnesses who stand in some special relationship to him). The foregoing evidence, including inferences that could be reasonably drawn therefrom, was more than a scintilla of proof that for fifteen months Hyco knew of May's peril, that it failed to use ordinary care to warn him of the known danger or implement the modification program, and that such failure was a reasonably foreseeable cause of his death. Thus, the negligence and proximate-cause findings against Hyco are supported by legally sufficient evidence.

Considering all of the evidence, especially the inferences arising from Hyco's failure to produce evidence within its control and to call witnesses with which it had a special relationship or that were peculiarly within its control, the evidence was factually sufficient to support findings of Hyco's negligence and proximate cause. Points eleven through fourteen are overruled.

Hyco also attacks the legal and factual sufficiency of the evidence supporting findings that it was grossly negligent, that its gross negligence was a proximate cause of May's death, and the amount of exemplary damages assessed against it. A legal-sufficiency attack on a finding of gross negligence requires the defendant to establish that there was no evidence to support the finding, not that there was some evidence of some care on his part. *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 920–21 (Tex. 1981). Consequently, when there is some evidence of an entire want of care, which gross negligence requires, and also some evidence of some care by the defendant, the no-evidence point must fail. *Id.* at 921.

A defendant must act or fail to act with conscious indifference before he is guilty of gross negligence, i.e., the plaintiff must show the defendant knew of the peril, but that his acts or omissions demonstrated he did not care. *Id.* at 922. There must be an entire want of care on the defendant's part. *Id.* at 920.

The evidence set forth above, including inferences that could be reasonably drawn from it, was some evidence that Hyco knew May was in dangerous peril, but consciously made no effort over a fifteen-month period to warn him of the danger or modify his dozer, and that such conscious indifference was a reasonably foreseeable cause of May's death. Likewise, considering all of the evidence and inferences, both for and against the challenged findings, the evidence was also factually sufficient to support findings that May's death was proximately caused by Hyco's gross negligence. Points fifteen through eighteen are overruled.

Finally, Hyco contends the $550,000 in exemplary damages assessed against it was excessive. Exemplary damages must be reasonably apportioned to actual damages, but there is no requisite ratio between the two. *Alamo Nat. Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). Factors which bear on the reasonableness of punitive damages include the nature of the wrong, the character of the defendant's conduct, the degree of the defendant's culpability, the relative situation and sensibilities of the parties, and the extent to which

the defendant's conduct offends a public sense of justice and propriety. *Id.* Hyco argues that, considering these factors, the exemplary-damage award was excessive.

██ The jury awarded the plaintiffs $1,050,00 in actual damages, attributed fifteen percent of causation to Hyco, and assessed Hyco's exemplary damages at $550,000. Comparing Hyco's liability for actual damages ($1,050,000 × .15 = $157,500) with the award of $550,000 in exemplary damages, a 3.5:1 ratio, one cannot say Hyco's exemplary damages were unreasonably apportioned by the jury. Finally, considering Hyco was responsible for implementing the modification program in the field, its knowledge of the peril to May, the apparent ease with which it could have warned him of the danger, the monthly reminders Hyco received from John Deere that May's dozer had not yet been modified, and the tragic result of its failure to act, the jury could have reasonably found Hyco's conduct to be reprehensible and worthy of punishment. Thus, the evidence was both legally and factually sufficient to support $550,000 in exemplary damages assessed against Hyco, and such an award was not excessive. Points nineteen through twenty-one are overruled.

## JOHN DEERE'S LIABILITY AND EXEMPLARY DAMAGES

The jury found that John Deere was negligent and grossly negligent in the recall of May's dozer, and that its negligence was a proximate cause of May's death. As already noted, the jury awarded the plaintiffs $1,050,000 in actual damages, apportioned eighty-five percent of causation to John Deere, and assessed its exemplary damages at $960,000. John Deere complains that the evidence was legally and factually insufficient to support a finding of gross negligence or the exemplary-damage award.

A no-evidence point attacking a finding of gross negligence is reviewed under the same rules which govern the disposition of any other no-evidence point. *Burk Royalty Co.*, 616 S.W.2d at 920–21. To prevail, the defendant must establish that there was no evidence of gross negligence, not merely that there was some evidence that he used some care. *Id.* Some evidence of an entire want of care dooms the point. *Id.* at 921.

██ Ignoring evidence and inferences to the contrary, the following supports the finding of gross negligence against John Deere. The company knew as early as 1971 that its dozers would shift into gear from neutral if they were left with their engines running, and over the years it continued to receive reports of similar occurrences. It knew the problem had not been corrected. Although John Deere notified dealers of this dangerous propensity in the 1970s, it did not warn dozer owners of the danger until 1983.

On May 13, 1983, John Deere used first-class mail to attempt to notify owners of the danger and inform them of the modification program. Thus, without a signed postal receipt from May, it had no way of knowing whether he had actually received the letter. The company, which compiled the list of owners from its Service Information System, admitted that May's name and correct mailing address appeared in its records and on the list of owners which it mailed to Hyco. Furthermore, May's name and correct mailing address continued to appear on Hyco's monthly reports of owners with unmodified dozers.

John Deere knew May had not responded to its original letter, because his name continued to appear on monthly reports listing owners in Hyco's trade area whose dozers had not been modified, but it made no further effort to contact him by phone or mail between May 1983 and his death in August 1984.[5] As it did in all modification programs, John Deere relied on its field representatives and dealers, such as Hyco, to "followup" with the owners. John Deere did not call as witnesses either its

---

**5.** John Deere mailed another warning letter to May in March 1986, seventeen months after his death.

field representative or any of Hyco's officers and employees.

■ A manufacturer cannot rely on an intermediary to warn those endangered by a product's use, unless it has reasonable assurance that the warning will be communicated by the intermediary. *Alm,* 717 S.W.2d at 591–92. Based on the evidence that May had not responded to the original warning letter and the monthly reports to Hyco, the jury could have reasonably found that John Deere had no such reasonable assurance that Hyco had warned May of the danger.

The foregoing evidence, including inferences that could be reasonably drawn from John Deere's failure to call its field representative or Hyco's officers and employees, was some evidence that John Deere knew of May's peril, but that it consciously failed to warn May of the danger or confirm that Hyco had delivered such a warning. Although the record contains some evidence of some care on John Deere's part, its no-evidence point must fail because there was some evidence of an entire want of care. *See Burk Royalty Co.,* 616 S.W.2d at 921. Point twenty-two is overruled.

John Deere argues, as did Hyco, that the evidence established May knew about the danger. It points to Bob Routzong's testimony that May had "heard" John Deere dozers might jump into gear on their own. However, as noted above, the jury could have rejected this portion of Routzong's testimony and, certainly, it was not conclusive proof that May had been warned of the danger, either by John Deere or Hyco. Considering the record as a whole, including evidence and inferences to the contrary, the evidence was factually sufficient to support a finding that John Deere was grossly negligent in the recall of May's dozer. The twenty-third point is overruled.

The jury assessed $892,500 ($1,050,000 × .85 = $892,500) in actual damages against John Deere, and $960,000 in exemplary damages. John Deere attacks the exemplary-damage award in points twenty-four through twenty-six.

■ Exemplary damages must bear a reasonable relationship to actual damages. *Alamo Nat. Bank,* 616 S.W.2d at 910. The ratio of John Deere's actual and exemplary damages shows the two awards were reasonably apportioned by the jury. Furthermore, considering the factors used to determine whether punitive damages are excessive, the evidence was both legally and factually sufficient to support the amount of the punitive award. *See id.* Points twenty-four through twenty-six are overruled.

TERESA MAY'S PECUNIARY LOSS

The jury awarded Teresa May, Robert May's minor daughter, $20,000 for past pecuniary loss and $10,000 for future pecuniary loss. "Pecuniary loss" was defined in the charge as "loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value" that Teresa would in reasonable probability have received from her father had he lived. The remaining points question whether the evidence was legally and factually sufficient to support the award of past and future pecuniary loss.

■ Damages in a wrongful death action are measured by the pecuniary loss to the beneficiary, except in a suit for the death of a child. *Yowell v. Piper Aircraft Corp.,* 703 S.W.2d 630, 635–36 (Tex.1986); *Sanchez v. Schindler,* 651 S.W.2d 249, 251 (Tex.1983). When the pecuniary-loss rule is applicable, recovery is limited to the present monetary value of the benefits, including money and everything that can be valued in money, which the beneficiary could reasonably expect to receive from the deceased had he lived. *Penguin Industries, Inc. v. Junge,* 589 S.W.2d 842, 848 (Tex.Civ.App.–Waco 1979, writ ref'd n.r.e.). A parent's services to a child, such as nurture, care, education, and guidance, have a monetary value in addition to any financial contributions. *Texas Consolidated Transportation Co. v. Eubanks,* 340 S.W.2d 830, 836 (Tex.Civ.App.–Waco 1960, writ ref'd n.r.e.).

Measuring a beneficiary's pecuniary loss is best left to the jury's common sense and

sound discretion because it is an inherently speculative and imprecise undertaking. *Green v. Hale,* 590 S.W.2d 231, 235–36 (Tex.Civ.App.–Tyler 1979, no writ). A court has noted the problems involved in proving and measuring pecuniary loss and in successfully attacking the jury's award:

The difficulties of proof in such matters are well known to the legal profession. No rule is prescribed for making the calculations. Exact ascertainment is obviously not possible. Juries from their own knowledge, experience and sense of justice are called upon to fix the compensation with reference as far as possible to conditions existing at the time of death. They are not to be influenced by passion or prejudice. The jury's estimate is not defined, but any estimate of the court is likewise undefined. The judgment of the jury is as good as that of the court, and it should prevail unless it appears that the verdict is influenced by passion or prejudice and is not the result of honest convictions.

*Louisiana & A. Ry. Co. v. Chapin,* 225 S.W.2d 614, 616 (Tex.Civ.App.–Texarkana 1949, writ ref'd). Valuing lost parental services is especially difficult. *Texas Consolidated Transportation Co.,* 340 S.W.2d at 836–37.

Was the evidence legally and factually sufficient to support Teresa's recovery of past and future pecuniary loss? John Deere and Hyco contend it was lacking because she failed to prove that her father was contributing financially to her support at the time of his death or intended to contribute to her support in the future. They argue the record shows nothing more than a "good relationship" between Teresa and her father, which cannot support the award. *See Pate v. Southern Pacific Transportation Co.,* 567 S.W.2d 805, 808 (Tex.Civ.App.–Houston [14th Dist.] 1978, writ ref'd n.r.e.).

The definition of pecuniary loss allowed the jury to consider the monetary value of May's parental services, as well as his financial contributions, in determining Teresa's pecuniary loss. However, John Deere and Hyco ignore the monetary value of May's parental services as a basis for the award, and concentrate their attack on the evidence as it relates to his financial contributions.

No witness placed a specific monetary value on May's parental services, but Teresa's award can be upheld without such evidence. *See Gainesville, H. & W. Ry. Co. v. Lacy,* 86 Tex. 244, 24 S.W. 269, 272 (1893); *Gulf, C. & S.F. Ry. Co. v. Ballew,* 66 S.W.2d 659, 663 (Tex.Comm'n App.1933, holding approved). Nor did she have to prove that he was actually rendering such services. *See Red Arrow Freight Lines v. Smith,* 93 S.W.2d 495, 497 (Tex. Civ.App.–El Paso 1936, writ dism'd). In fact, the jury could value May's parental services from evidence relating to his habits and personal characteristics. *See Ballew,* 66 S.W.2d at 663. This type of evidence is especially important in determining a child's pecuniary loss. *Allen v. Riedel,* 425 S.W.2d 665, 671–72 (Tex.Civ.App.– Eastland 1968, no writ). However, the child must show something more than a good relationship with the parent to support a recovery. *See Malone & Hyde, Inc. v. Hobrecht,* 685 S.W.2d 739, 748 (Tex. App.–San Antonio 1985, judgmt set aside).

Teresa, the adopted daughter of Jacklyn and Robert May, was seventeen when her father was killed and twenty-years old when the suit was tried. May was forty-nine at the time of his death, and the evidence indicated that he was hard-working, industrious, in good health, and a good and loving father and husband. He apparently had a close relationship with Teresa, often driving her to and from school and athletic events, and he likewise helped his wife with household duties. May was the principal contributor to his family's support. Teresa and her mother both testified about May's helpful and loving qualities.

The record reflects more than a bare father-daughter relationship, but contains evidence of May's personal habits and characteristics. Thus, the jury had evidence from which it could estimate the monetary value of May's parental services. Consequently, the evidence was both legally and factually sufficient to support a

recovery of the monetary value of May's parental services, separate from any financial contributions.

However, the jury also had evidence from which it could determine the monetary value of lost financial contributions. A plaintiff can recover for lost financial benefits even though there is no specific evidence of the amount of contributions being made by the deceased at his death or that he would make such contributions in the future. *See Texas & P. Ry. Co. v. Johnson*, 106 S.W. 773, 777 (Tex.Civ. App.1907, writ ref'd). Based on the evidence of May's personal characteristics and the financial support he was providing for his family, the jury could have reasonably found that he was contributing to Teresa's financial support, and that in all reasonable probability he would have continued to do so if he had lived. Thus, the evidence was legally and factually sufficient to support an award for the pecuniary loss, both past and future, of her father's financial contributions.

Teresa's award of past and future pecuniary loss was supported by legally and factually sufficient evidence of the monetary value of lost parental services and lost financial contributions or a combination of both. Accordingly, points twenty-seven through thirty-two are overruled.

All points of error have been overruled. The judgment is affirmed.