Williams v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-92-053-CR

     FRANKY MEL WILLIAMS,
                                                                                              Appellant
     v.

     THE STATE OF TEXAS,
                                                                                              Appellee
 

From the 220th District Court
Bosque County, Texas
Trial Court # 91-09-11493-BCCR
                                                                                                    

O P I N I O N
                                                                                                    

      Franky Williams appeals his conviction for two counts of aggravated robbery. Williams was
found guilty by a jury, and the jury assessed punishment at thirty-five years in prison. We affirm
the judgment.
      In points one and two, Williams contends that the court erred in overruling his objection to
the failure of the court's charge on punishment to limit the jury's consideration of evidence that
he later bought methamphetamine with the proceeds from the robbery to the purpose for which
it was admitted. On cross-examination during the guilt-innocence phase of the trial, Williams
testified as follows:
QWhat did you sell up in Dallas?
 
AJewelry.
 
QHow much money did you get?
 
AI don't really remember.
 
QDid you split the money up?
 
AYes, sir.
 
QThen you came—then what did you do? Where did you go from Dallas?
 
AWe stopped in—I guess Oak Cliff or—I'm not sure where it was at. We stopped
there and—and Wayne called one of his friends and we was going—we was going
to get some crank.
 
QSome what?
 
ACrank.
 
QWhat's that?
 
AI guess you consider it dope.
 
QThat's methamphetamine?
 
AYes, sir.
 
QDid you get it?
 
AYes, sir.
 
QWhat did you do with it?
 
AWell, snorted it.
 
QYou mean to tell me that you took this property that you had stolen from the Bellahs
and you traded it for drugs?
 
AYes, sir.
 
QThen you used those drugs?
 
AYes, sir.

      Williams' testimony was admitted without objection or request for a limiting instruction. 
Because the evidence was not admitted for a limited purpose, no limiting instruction was required
in the court's charge to the jury.


 Therefore, we overrule points one and two.
      In point three, Williams contends that the trial court erred in overruling his objection to
improper argument made by the prosecutor during the punishment phase of the trial. Proper jury
argument falls within one of the following categories: (1) a summary of the evidence; (2) a
reasonable deduction from the evidence; (3) an answer to the opponent's argument; or (4) a plea
for law enforcement.


 All other arguments are improper. The prosecutor made the following jury
argument during the punishment phase of the trial:
We know that after the robbery they went to Dallas and began pawning the—the
property. We know that with the substantial portion of the property he bought dope
(indicating). They all bought dope. They split—
 
[Defense Counsel]: Objection, Your Honor. We're going to renew our objection. 
He's asking the Court to set—I mean asking the jury to sit here and sentence the man for
an extraneous offense. I request a limiting instruction and I object and move for a
mistrial on that point.
 
THE COURT: Overrule your objection.

As previously discussed, Williams' testimony was admitted without objection or request for a
limiting instruction. No error is presented because the complained-of remarks by the prosecutor
during closing argument were about statements in evidence.


 Although the State must avoid
presenting an argument that encourages the jury to include in their verdict additional punishment
for a collateral crime, the prosecutor in this case never specifically asked the jury to punish
Williams for possession of a controlled substance.


 Because the prosecutor's argument was proper
as a summary of the evidence,


 we overrule point of error three.
      In points four and five, Williams contends that the court erred in failing to submit a charge
on the lesser included offense of robbery. For a charge on the lesser-included offense of robbery
to have been required, there must be some evidence in the record that, if Williams is guilty, he
is only guilty of the lesser offense of robbery.


 Williams admitted at trial that he entered the house
with a sawed-off shotgun and announced, "This is a robbery." According to section 29.03(a)(2)
of the Texas Penal Code, a person commits aggravated robbery if he commits robbery and he uses
or exhibits a deadly weapon.


 Because Williams' use or exhibition of a deadly weapon is
uncontroverted, if he was guilty, he could only be guilty of aggravated robbery. We overrule
points of error four and five.
      In points six and seven, Williams contends that the trial court erred in failing to require the
jury to find that Williams threatened or placed the victims in fear of imminent bodily injury or
death by exhibiting a deadly weapon. The court charged the jury as follows:
Our law provides that a person commits the offense of robbery if, in the course of
committing theft of property, as that term is hereinafter defined, and with intent to obtain
control of property of another, he intentionally threatens or places another in fear of
imminent bodily injury or death.
The offense is aggravated robbery if the person committing robbery uses or exhibits
a deadly weapon.

      Williams argues, without any supporting authority, that for a robbery to constitute aggravated
robbery there must be a finding that the threat or fear of imminent bodily injury or death was
generated by the use or exhibition of a deadly weapon. Section 29.03(a)(2), however, requires
only that the person who commits robbery "uses or exhibits a deadly weapon." Because the
application paragraphs for both counts of aggravated robbery contained every statutory element
of the charged offense, the charge in this case was not erroneous.


 We overrule points of error
six and seven.
      We affirm the judgment.
 
                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Justice Cummings and
          Justice Vance
          {Chief Justice Thomas not participating)
Affirmed
Opinion delivered and filed December 16, 1992
Do not publish



 Civ. App.—Dallas 1949, writ ref'd n.r.e.); Glasscock v.
Farmers Royalty Holding Co., 152 F.2d 537, 540 (5th Cir. 1945) (applying Texas law); accord
Ellison v. Evergreen Cemetery, 628 A.2d 793, 799 (N.J. Super. Ct. App. Div. 1993); Estate of
Kinsey v. Janes, 613 N.E.2d 686, 690 (Ohio Ct. App. 1992). The rule was accurately and
concisely stated by Professor Corbin:
It is often said that the parties to an illegal contract can not validate it by a subsequent
ratification. This is quite true so long as there has been no change in the law or in the facts
as would cause the bargain to be valid and enforceable if made at the time of ratification. 
If, however, such a change has occurred, the ratification may itself constitute an
enforceable contract. Neither the making of such a bargain or its performance is any
longer prohibited; and all that is now necessary is that the ratifying transaction shall itself
fulfill ordinary contract requirements.

6A A. Corbin on Contracts § 1532 at 806 (1962). The lease agreement, including both the
primary ten-year term and the optional 35-year term, was void when executed in 1978 by virtue
of the operation of the version of section 161.227 in effect at the time. In 1981, section 161.227
was amended in such a way that the lease agreement between TU Electric and Woody, had it been
executed subsequent to the effective date of amended section 161.227, would have been
enforceable. In 1987, in consideration for $20, Woody ratified the lease agreement. The only
question, then, is whether the ratification constituted an enforceable contract.
          The record reveals that the elements required for an enforceable contract were met in the
1987 ratification agreement. NWR obtained from Woody the authority to mine lignite and coal
from the property, and Woody obtained from NWR a royalty interest in that lignite and coal
produced and $20. The parties formalized their mutual agreement to the ratification in a written
document they both signed on January 28, 1987. Having found the contractual elements of offer,
acceptance, and consideration, we conclude the 1987 ratification is a valid contract which rendered
the 1978 lease agreement enforceable.
          TCA raises the issue of whether the 1987 ratification agreement is effective only
subsequent to its execution date or whether it relates back to August 11, 1978, the date of the
original lease agreement. The ratification is certainly valid at least from January 28, 1987, and,
under the facts of this case, there is no reason for us to decide if it was effective retroactively. 
Chester v. Breitling, 89 Tex. 137, 32 S.W. 527, 529 (1895). TCA's purchase of the property
from Woody occurred in 1991, four years after the ratification agreement. Accordingly, it is
sufficient to hold that the ratification agreement was effective from the date of its execution.
          TCA also argues that any ratification of the 1978 lease cannot be effective because
subsequent changes in law do not have the effect of validating previously illegal contracts, and it
cites several cases in support of its argument. See Fitzsimons v. Eagle Brewing Co., 107 F.2d
712, 713-14 (3rd Cir. 1939); Branch v. Mobil Oil Corp., 772 F.Supp. 570, 571 (W.D. Okla.
1991); Sabine Corp. v. ONG Western, Inc., 725 F.Supp. 1157, 1183 (W.D. Okla. 1989);
Gugliotta v. Evans & Co., Inc., 690 F.Supp. 144, 148 (E.D. N.Y. 1988); Toll v. Friedman, 74
N.Y.S.2d 176, 177 (N.Y. App. Div. 1947); Estate of Kinsey, 613 N.E.2d at 690; State v. Braun,
301 N.W.2d 180, 191 n.10 (Wis. 1981) (Abrahamson, J., dissenting); Marcomo Stevedoring
Corp. v. Nathanson, 108 N.Y.S.2d 789, 792-93 (N.Y. Sup. Ct. 1951). We decline, however, to
address the issue of whether the mere change in law will automatically ratify a previously illegal
contract; instead, we rest our holding solely on the ground that the express ratification of a
previously illegal agreement subsequent to a change in the law that removes the illegality of the
agreement validates the original agreement. 
          TCA further argues that the 1978 lease agreement could not be ratified because section
161.227 expressly deemed agreements in violation of its requirements void. TCA asserts that
there is a difference between an illegal contract and a void contract. Illegal contracts, however,
are void. Paragon Oil Syndicate v. Rhoades Drilling Co., 115 Tex. 149, 277 S.W. 1036, 1037
(1925); Texas Life, Accident, Health and Hosp. Serv. Ins. Guar. Ass'n v. Lorena State Bank, 911
S.W.2d 842, 844 (Tex. App.—Austin 1995, n.w.h.); Rogers v. Wolfson, 763 S.W.2d 922, 924
(Tex. App.—Dallas 1989, writ denied); Ben E. Keith Co. v. Lisle Todd Leasing, Inc., 734 S.W.2d
725, 727 (Tex. App.—Dallas 1987, writ ref'd n.r.e.); Jack, 694 S.W.2d at 397; Peniche, 580
S.W.2d at 157. If an illegal contract may properly be ratified subsequent to a change in law that
removes the invalidating quality of the law as it previously stood, then the rule is the same for void
contracts. TCA's argument is without merit. Its first point is overruled.
          In its second point of error TCA argues the trial court had no discretion to rule on March
11, 1994, that the 1978 lease could be ratified when it had earlier ruled on March 12, 1993, on
a summary judgment motion that the 1978 lease was void when executed. Our holding in TCA's
first point indicates that the 1978 lease, although void when executed, could subsequently be
ratified under the facts of this case. Therefore, there is no inconsistency between the trial court's
ruling on the motion for summary judgment and its final judgment. TCA's second point is
overruled.
          In its third point, TCA contends the trial court erred in denying its request to declare void
the 1986 assignment of the 1978 option from TU Electric to NWR. It contends that because the
option was void when executed in 1978, it constituted a nullity and a nullity could not be assigned. 
Jack, 694 S.W.2d at 397. Our holding under TCA's first point of error, however, reveals that
the 1978 option was not a nullity. It was capable of being ratified once the law changed in 1981
to permit the type of lease agreement that was agreed to by Larry and TU Electric in 1978. We
overrule TCA's third point.
III. Whether the Trial Court Erred in Admitting the Supplement
          TCA in its fourth point contests the trial court's ruling that the Supplement to the Release
of Exclusivity and License (hereafter the supplement) filed on February 9, 1994, was admissible. 
It contends the supplement was tantamount to a settlement offer and therefore inadmissible under
Tex. R. Civ. Evid. 408.



          Offers made to settle disputed claims are not admissible to prove liability. Tex. R. Civ.
Evid. 408; Ford Motor Co. v. Leggat, 904 S.W.2d 643, 649 (Tex. 1995) (orig. proceeding);
Tatum v. Progressive Polymers, Inc., 881 S.W.2d 835, 837 (Tex. App.—Tyler 1994, no writ). 
Rule 408, however, does not bar the admission of settlement offers when offered for a purpose
other than that of proving the liability for or the invalidity of a claim or its amount. Tex. R. Civ.
Evid. 408; Barrett v. United States Brass Corp., 864 S.W.2d 606, 633 (Tex. App.—Houston [1st
Dist.] 1993), rev'd on other grounds sub nom Amstadt v. United States Brass Corp., 39 Tex. Sup.
Ct. J. 351 (March 7, 1996). The offers may be admissible for another purpose, such as to
demonstrate bias or prejudice. Tex. R. Civ. Evid. 408; General Motors Corp. v. Saenz, 829
S.W.2d 230, 243 (Tex. App.—Corpus Christi 1991), rev'd on other grounds, 873 S.W.2d 353
(Tex. 1993); C & H Nationwide, Inc. v. Thompson, 810 S.W.2d 259, 269 (Tex. App.—Houston
[1st Dist.] 1991), rev'd on other grounds, 903 S.W.2d 315 (1994); Ochs v. Martinez, 789 S.W.2d
949, 959-60 (Tex. App.—San Antonio 1990, writ denied) (on rehearing). The burden is on the
party objecting to the evidence to show that it was offered as part of settlement negotiations and
not offered for another purpose. Haney v. Purcell Co., Inc., 796 S.W.2d 782, 790 (Tex.
App.—Houston [1st Dist.] 1990, writ denied). In deciding whether the evidence is being
impermissibly offered as evidence of a settlement offer or whether it is being offered for some
other valid reason, the trial court may properly exercise its discretion. Tatum, 881 S.W.2d at 837. 
Only when the trial court abuses its discretion will its ruling be disturbed on appeal. See id.
          TCA's argument begins with the language of the supplement, itself, which reads, in part,
"This waiver is given to help settle the dispute that has arisen between T.C.A. and
Northwestern[.]" Notwithstanding TCA's arguments to the contrary, there is evidence in the
record that NWR offered the supplement for a purpose other than to settle the parties' disputes. 
On December 9, 1993, NWR filed an instrument entitled "Release of Exclusivity and License"
(hereafter the release) through which NWR attempted to convey its interest in the minerals in and
under the property to TCA. TCA, however, upon learning of the existence of the release, hired
an expert in oil and gas law to determine its validity. The expert, Johnny Johnson, opined that
the release was ineffective to convey NWR's lease interest in the property.


 According to NWR,
it filed the release to allow TCA to mine the property and sell the lignite to HL&P, and it filed the
supplement to further clarify what it contended was the meaning of the release. Indeed, TCA
admits in its brief that this was one of the two reasons why NWR offered the supplement into
evidence.


 NWR undeniably was within its rights in attempting to demonstrate that TCA suffered
no damages as a result of NWR's actions. Finding evidence in the record to support the trial
court's ruling, we conclude the court did not err in admitting the supplement into evidence. 
Tatum, 881 S.W.2d at 837-38. TCA's fourth point is overruled.
          In its fifth point TCA contends that the supplement, even if admissible under Rule 408, was
nevertheless inadmissible under Rule 403 of the Rules of Civil Evidence because its probative
value was substantially outweighed by the danger of unfair prejudice that would result from its
admission. Tex. R. Civ. Evid. 403. TCA maintains that it suffered extreme prejudice for two
reasons: (1) because the supplement was created after TCA had rested its case-in-chief, thereby
depriving it of a sufficient opportunity to present evidence in opposition to it and (2) because NWR
admitted the supplement was cumulative evidence. We disagree.
          Rule 403 requires the trial court to conduct a balancing test to determine whether or not
the proffered evidence is admissible. John Deere Co. v. May, 773 S.W.2d 369, 373 (Tex.
App.—Waco 1989, writ denied). The trial court has wide latitude to exclude evidence if it creates
undue prejudice, distracts the jury from the main issue or issues, if it consumes an undue amount
of time, or if it unfairly surprises the proponent's adversary. Charter Medical Corp. v. Miller,
605 S.W.2d 943, 953 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.). The trial court's ruling
will be upheld absent an abuse of discretion. Sims v. Brackett, 885 S.W.2d 450, 453 (Tex.
App.—Corpus Christi 1994, writ denied); New Braunfels Factory Outlet Center, Inc. v. IHOP
Realty Corp., 872 S.W.2d 303, 310 (Tex. App.—Austin 1994, no writ).
          Considering its first contention, TCA was not deprived of an opportunity to respond to the
supplement. Once NWR let it be known that it wished to enter the supplement into evidence, TCA
requested permission from the trial court to reopen its case and question one of its expert
witnesses, Mike Kolin, on it. The request was granted, at least insofar as to permit TCA to
question Kolin at some point. TCA, however, decided two days later not to put Kolin back on the
stand to testify against the supplement because Kolin had apparently stated, according to TCA, that
he would require 90 to 100 days to study it and that the study would require a "ton" of money.
          TCA waived any complaint that it was somehow unfairly surprised by the admission of the
supplement. Once it learned that NWR wished to offer the supplement into evidence, TCA
requested permission from the trial court to recall one of its witnesses to respond to it. TCA then
learned that it would cost a lot of money and would take a lot of time to perform a sufficient
analysis. TCA's complaint about the cost of the preparation is without merit because TCA would
have had to bear the cost at any time for its expert to study the document. Regarding the amount
of time Kolin would require to analyze the supplement, TCA waived any complaint in failing to
ask the trial court for a continuance, or some other similar relief, until Kolin could complete the
task. See F & S Offshore, Inc. v. K.O. Steel Castings, Inc., 662 F.2d 1104, 1108 (5th Cir. 1981);
Jack B. Weinstein & Margaret A. Berger, 1 Weinstein's Evidence, United States Rules, §
403[01] (1993). Although it may appear that there was no possible way by which the trial court
would grant such a long continuance, the matter was not brought before the court. A hearing
could have been conducted to challenge Kolin on his estimation for the length of time he claimed
to require; perhaps he might have been able to produce the study in a more abbreviated fashion
that would have been acceptable to all of the parties. Because the request was never made, the
trial court did not have an opportunity to undertake this examination. Moreover, by failing to
make the request, TCA could be considered to have abandoned its hope of being able to adequately
respond to the supplement in favor of hiding behind an evidentiary rule that could later be
exploited for a reversal if the judgment proved to be unfavorable. Clark v. Pennsylvania R.R.
Co., 328 F.2d 591, 593 (2nd Cir.), cert. denied, 377 U.S. 1006, 84 S.Ct. 1943 (1964); see
Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner, and Smith, Inc., 805 F.2d 49, 53-54 (2nd Cir. 1986); Millers' Nat'l Ins. Co., Chicago, Illinois v. Wichita Flour Mills Co., 257 F.2d
93, 98-99 (10th Cir. 1958). We therefore conclude that TCA waived any complaint it may have
had in being surprised by the supplement by failing to request a continuance or other appropriate
relief.
          Similarly, there is no merit to TCA's argument that the evidence was prejudicial because
NWR admitted that it was merely cumulative. The essence of NWR's comment was that there was
nothing new to the supplement that was not in the release. NWR's position has always been that
it offered the supplement solely to clarify the release, not to add anything to it or change its terms. 
On the other hand, TCA argued at length to the trial court that the legal effect of the supplement
was different than the legal effect of the release. Through its expert, Johnson, TCA contended
that the release accomplished an incomplete conveyance of NWR's mineral interests in the
property to TCA. It then argued that the supplement constituted a complete conveyance of the
estate. If the supplement was truly cumulative of the release, TCA would have not made this
argument. Finding both arguments to be without merit, we overrule TCA's fifth point.
IV. Whether the Evidence Was Factually Sufficient on the Issues of Fraud,
Trespass, and Damages

          In its sixth point of error, TCA asserts the jury's finding on the fraud issue is against the
great weight and preponderance of the evidence. The substance of TCA's fraud cause of action
involves the representations NWR made to Woody in the ratification agreement. Deposition
testimony from Woody was offered at trial that had he known the lease was invalid at the time
NWR asked him to sign the ratification agreement, he would have refused to sign it.


 NWR,
according to TCA, intentionally deceived Woody by stating in the agreement that "the option and
all rights and privileges therein" were "owned and held" by NWR. TCA contends that this
assertion obviously was not true before the ratification was signed because section 161.227
rendered the 1978 lease agreement void and NWR knew that the agreement was void because it
had previously received a lawyer's title opinion to this effect.
          In reviewing a factual sufficiency point, the court of appeals must weigh all of the evidence
in the record, both favorable and unfavorable to the judgment. Ortiz v. Jones, 39 Tex. Sup. Ct.
J. 294, 295 (February 9, 1996). The findings of the trier of fact may be overturned only if they
are so against the great weight and preponderance of the evidence as to be clearly wrong and
unjust. See id.
          TCA's contention is without merit. The record reveals that in 1982 a lawsuit was filed by
an attorney named Jack N. Webernick on the behalf of Woody and others seeking to invalidate the
lease agreement on the ground that it was void under section 161.227. The suit was later
dismissed for want of prosecution. As TCA asserts in its brief, one of the elements of fraud is that
the putative victim reasonably relied upon the representation or representations of the defendant. 
Sears, Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282 (Tex. 1994). TCA submits that Woody
reasonably relied upon NWR's statement in the ratification agreement that it owned the rights to
the lease. Woody, however, knew that this assertion was questionable when he filed his suit in
1982. Pentikis v. Texas Electric Service Co., 470 S.W.2d 387, 390 (Tex. Civ. App.—Fort Worth
1971, writ ref'd n.r.e.) (a party to a lawsuit is charged with knowledge, as a matter of law, of all
steps taken and claims made in the suit).


 Therefore, the evidence supports the jury's implicit
finding that Woody did not reasonably rely upon NWR's statements.


 TCA's sixth point of error
is overruled.



          In its seventh point TCA contends the jury's findings on its trespass claim are also factually
insufficient. In our disposition of TCA's first three points of error, however, we determined that,
due to the 1987 ratification agreement, NWR's 1978 lease was valid. Because the 1978 lease was
valid, NWR had a right to mine the lignite. Therefore, it was entitled to be on the property. 
TCA's seventh point is overruled.
          In its eighth point, TCA argues the evidence is insufficient to support the jury's finding that
NWR did not reduce the value of the property by its mining operations on the surrounding tracts. 
TCA identifies a sole piece of evidence in support of its argument—an admission by NWR that
"by May 1, 1993, the mining and reclamation operations [conducted by NWR would] bypass the
[property] to the point that it is not economically feasible to produce lignite from [it]."
          Michael McLaughlin testified that TCA expected to receive a return of $300,000 to
$400,000 on its $130,000 investment in the property. TCA later agreed with HL&P to sell the
lignite in the property to them for approximately $34 million. Without further argument and
citation to the record from TCA on the issue, we are unable to find the facts insufficient to support
the jury's finding of no reduction in the value of the property. See Tex. R. App. P. 74(f). 
Therefore, TCA's eighth point is overruled.
V. Whether There Was Error in the Accord and Satisfaction Defense
          TCA in its ninth and tenth points of error complains (1) that the trial court should not have
submitted the accord and satisfaction defense to the jury and (2) the evidence is insufficient to
support the jury's acceptance of NWR's accord and satisfaction affirmative defense. We need not
address these issues, however, because TCA has failed on each of its causes of action. Therefore,
any error in the accord and satisfaction finding would be harmless. Tex. R. App. P. 81(b)(1);
Westbrook v. Texas & P. Ry. Co., 203 S.W.2d 279, 286-87 (Tex. Civ. App.—Eastland 1947, writ
ref'd n.r.e.). TCA's ninth and tenth points are overruled.
VI. Whether NWR Was Guilty of Unclean Hands
          TCA in its eleventh point argues that NWR was not entitled to the equitable defense of
estoppel because the evidence conclusively established that NWR had "unclean hands." Similar
to our rejection of TCA's ninth and tenth points, however, we need not consider this point of error
because TCA failed on each of its causes of action; therefore, any error would be harmless. Tex.
R. App. P. 81(b)(1); Estes v. Reding, 398 S.W.2d 148, 150 (Tex. Civ. App.—El Paso 1965, writ
ref'd n.r.e.). TCA's eleventh point is overruled. The judgment is affirmed.

                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Justice Cummings and
         Justice Vance
Affirmed
Opinion delivered and filed April 30, 1996
Publish