

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00263-CV

The **ESTATE OF** Carolina M. **MUNIZ**, Michael Muniz, Sr., Gloria A. Gutierrez,
Jose Muniz, Jr., Gabriel Muniz, and Coleen Muniz,
Appellants

v.

**FORD MOTOR COMPANY**,
Appellee

From the 38th Judicial District Court, Medina County, Texas
Trial Court No. 10-07-20143-CV
Honorable Camile G. Dubose, Judge Presiding

Opinion by:　Catherine Stone, Chief Justice

Sitting:　　Catherine Stone, Chief Justice
　　　　　Karen Angelini, Justice
　　　　　Rebeca C. Martinez, Justice

Delivered and Filed:　June 12, 2013

AFFIRMED

This appeal arises from a tragic one-car automobile accident in which Carolina Muniz

was fatally injured. The appellants raise numerous issues on appeal, primarily challenging

evidentiary rulings, the exclusion of a question from the jury charge, jury argument, and the costs

awarded to Ford. We overrule these issues and affirm the trial court's judgment.

## FACTUAL BACKGROUND

Muniz was fatally injured when she was run over by her Ford F-150 as she attempted to re-enter the truck after exiting to open a gate. The gate encloses all but the first several feet of Muniz's driveway. Muniz parked in front of the gate and exited her truck to open the gate. As she was re-entering the truck to pull further into her driveway, the truck started moving in reverse. Muniz lost her footing, and the truck ran over her torso. Although conscious at the scene, Muniz died en route to the hospital.

The appellants sued Ford Motor Company, alleging that a design defect allowed the F-150 to be placed in "false-park," by shifting in-between reverse and park. Although the truck temporarily remained stationary in "false-park," the appellants alleged that the vehicle self-reengaged in reverse when Muniz was re-entering the truck.

Ford alleged that Muniz was negligent in exiting her vehicle without turning it off, removing the key, and engaging the parking brake. Ford contends that Muniz would have been unable to remove the key if the vehicle was in any gear other than park, and engaging the parking brake would have prevented a vehicle in "false-park" to move in reverse. Ford's theory was that Muniz had shifted into reverse, but a curb cut located in front of the gate kept the truck from moving until Muniz's actions in re-entering the truck dislodged the truck from the curb cut.

A jury found there was no design defect in Muniz's Ford F-150 that was a producing cause of the accident and found that Muniz's negligence was a proximate cause of the accident. The trial court entered a take-nothing judgment on the appellants' claims and awarded Ford $14,958.87 in costs.

## OTHER SIMILAR INCIDENTS

In their first point of error, appellants complain about the trial court's exclusion of various categories of evidence that appellants describe as "other similar incident" evidence.

Appellants' brief does not clearly identify the categories of evidence about which they complain; however, Ford's brief lists those categories as: (1) other similar incidents investigated by Gerald Rosenbluth, one of the appellants' experts; (2) other similar incidents reviewed by James Williams, another expert for the appellants; (3) lawsuits and investigations involving retired Ford engineer Fred King and Ford engineer Mark Taylor; (4) Exponent's videotaped test; and (5) two National Highway Traffic Safety Administration (NHTSA) investigations and one NHTSA preliminary evaluation. Appellants' reply brief tracks these categories, and does not assert that Ford failed to address a specific category. Therefore, we address appellants' complaint based on these categories.

We review a trial court's evidentiary rulings under an abuse of discretion standard. *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *Volkswagen of America, Inc. v. Ramirez*, 159 S.W.3d 897, 918 (Tex. 2004). A trial court abuses its discretion if it acts in an unreasonable or arbitrary manner, or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). An erroneous ruling regarding the admissibility of evidence warrants reversal only if the error probably caused the rendition of an improper judgment. *Bay Area Healthcare Group, Ltd.*, 239 S.W.3d at 234; *Volkswagen of America, Inc.*, 159 S.W.3d at 918. "To make this determination, we review the entire record." *Volkswagen of America, Inc.*, 159 S.W.3d at 918. An erroneous evidentiary ruling will not require reversal if the evidence in question is cumulative. *Id.*

A.     General Law on Other Similar Incidents

Proof of other incidents or accidents may be admissible in a product defect case. *Nissan Motor Co., Ltd. v. Armstrong*, 145 S.W.3d 131, 138 (Tex. 2004). However, several restrictions apply to the admissibility of such evidence. *Id.*

First, "the other incidents must have occurred under reasonably similar (though not necessarily identical) conditions." *Id*. "'Reasonably similar circumstances generally means the same type of occurrence.'" *Penalver v. Living Centers of Tex., Inc.*, No. 04-02-00920-CV, 2004 WL 1392268, at *3 (Tex. App.—San Antonio June 23, 2004, no pet.) (mem. op.) (quoting *Huckaby v. A.G. Perry & Son, Inc.*, 20 S.W.3d 194, 201 (Tex. App.—Texarkana 2000, pet. denied)); *see also John Deere Co. v. May*, 773 S.W.2d 369, 372-73 (Tex. App.—Waco 1989, writ denied). To prove the proper predicate in a product defect case, the proponent of the evidence must establish that the defect that caused the other incidents was similar to the defect alleged in the case at hand. *Nissan Motor Co., Ltd.*, 145 S.W.3d at 141.

"Second, evidence of similar incidents is inadmissible if it creates undue prejudice, confusion or delay." *Id*. at 138. "[P]rolonged proof of what happened in other accidents cannot be used to distract a jury's attention from what happened in the case at hand." *Id*.

"Third, the relevance of other accidents depends upon the purpose for offering them." *Id*. Other accidents may be relevant to show whether a product was defective or unreasonably dangerous or that a manufacturer was on notice of prior or continuing problems with the product. *See id*. at 138-39; *see also John Deere Co.*, 773 S.W.2d at 372 (citing several cases holding other accidents admissible to show manufacturer's knowledge of problem). If the other accidents are offered to prove a product was defective or unreasonably dangerous, only accidents occurring before the production and sale of the product in question are admissible, not accidents occurring after, because "[w]hether a product was defective must be judged against the technological context existing at the time of its manufacture." *Nissan Motor Co.*, 145 S.W.3d at 139.

B.      Other Similar Incidents Investigated by Rosenbluth

1.      Waiver

The appellants complain about the exclusion of Rosenbluth's testimony regarding eight additional park-to-reverse incidents that Rosenbluth investigated.  At the conclusion of the proffer regarding this excluded testimony, however, Ford's attorney listed its objections to the admission of this testimony as: (1) hearsay; (2) lack of foundation because Rosenbluth had no personal knowledge of the details of the incidents but relied upon police reports, depositions, and witness statements; (3) the incidents were not substantially similar; (4) the testimony was not relevant; and (5) the testimony was overly prejudicial under Rule 403 because it would confuse the issues and require mini-trials on the cause of each incident.  Similar objections were made during a discussion before Rosenbluth testified, after which the trial court ruled Rosenbluth could testify regarding the number of investigations he had undertaken but not the details of the particular investigations.  The appellants' brief, however, addresses only the hearsay objection and whether the incidents were substantially similar.  Because the brief does not address the other grounds for exclusion raised by Ford's objections, and those grounds could have been the basis for the trial court's ruling, appellants have failed to preserve their complaint with regard to the admission of this evidence.  *Collin County v. Hixon Family P'ship, Ltd.*, 365 S.W.3d 860, 877 (Tex. App.—Dallas 2012, pet. denied).

2.      Rule 403 – Confusion and Prejudice

Even if appellants had preserved this complaint for our review, Rosenbluth admitted during the proffer that Ford reached a different conclusion regarding the cause of the incident in each of the eight cases.  This admission supports Ford's objection that testimony regarding the details of these incidents would require a mini-trial on causation for each incident.  Therefore,

the trial court would not have abused its discretion in excluding the testimony under Rule 403.[1]
TEX. R. EVID. 403; *see also Nissan Motor Co., Ltd.*, 145 S.W.3d at 138 ("[P]rolonged proof of what happened in other accidents cannot be used to distract a jury's attention from what happened in the case at hand.").

C.      Details of Other Similar Incidents Reviewed by Williams

The trial court allowed Williams to testify about 12 pre-sale complaints involving park-to-reverse incidents, including six complaints made to NHTSA and six complaints made to Ford. The appellants contend, however, that the trial court erred in excluding Williams's testimony that the 12 pre-sale complaints were included among a total of 58 reverse-to-park complaints which were of a type that would require Ford to conduct a detailed investigation of the cause. The appellants also assert the trial court erred in refusing to allow Williams to testify regarding the details of the 12 pre-sale complaints.

Ford responds that the complaints in question consisted of unsubstantiated customer complaints. Ford asserts the trial court actually overruled all of its objections and permitted Williams to testify about the 12 customer complaints. With regard to the additional complaints, Ford contends that Williams admitted those complaints were not substantially similar. With regard to the details of the complaints, Ford asserts the appellants "disavowed any attempt to introduce the contents of the complaints." In addition, Ford contends the appellants failed to make an offer of proof on the details of the complaints until months after the trial had concluded.

---

[1] We note that the trial court allowed Rosenbluth to testify regarding the number of prior incidents he had investigated regarding park-to-reverse incidents. Rosenbluth testified that he had been asked to "look at vehicles for inadvertent rearward movement" approaching 200 times, that he had been involved in 75 cases involving inadvertent rearward movement in Ford vehicles, and had concluded that a "false-park" was the cause of an accident in 5-10 cases involving a Ford vehicle with the same family of transmissions as the transmission in Muniz's F-150.

1.       Proffer, Objections and Ruling

During the proffer of Williams's testimony outside the jury's presence, Williams testified that he identified 58 complaints that would be a "yellow light" to Ford, and the 12 complaints that were admitted would be a "red light," mandating further investigation. Williams admitted, however, that he had not investigated the complaints and did not know if the complaints were true. Williams was then asked about the 58 complaints in further detail:

> Q.      Are all of the 58 substantially similar systems?
> A.      No. These are inadvertent movement, which was too general and it should raise a yellow flag, as I indicated in discussion I narrowed that down to six where the narrative was accurate, was substantial enough to indicate it was a circumstance similar to the Muniz incident.
> ***
> Q.      So the difference in the 58 and six is not whether the vehicles are substantially similar. It's whether the actual content of the complaint was substantially similar to what was alleged to have occurred in the Muniz case.
> A.      As well as the vehicle transmission park system.
> ***
> Q.      Mr. Williams, had you been allowed as to the 58, would you testify that they were all substantially similar?
> A.      Not the 58. The six.

At the conclusion of the proffer, Ford made the following objections: (1) hearsay; (2) lack of personal knowledge/foundation; (3) absence of substantial similarity; (4) relevance; and (5) Rule 403 overly prejudicial. In response, the appellants' attorney reiterated that they were "not going to seek to admit the actual contents of any of the complaints." Although appellants' attorney stated that under the *Nissan* case, he thought he "could probably get those admitted, the contents admitted," he was "not going to do that," but was instead seeking to admit the number of complaints "for notice purposes." The trial court ruled that Williams could talk about the 12 "red light" complaints, but not about the specifics of the complaints.

2.      Trial Testimony

At trial, Williams testified that he was provided customer complaints "on, in the most general terms, on inadvertent rearward movement."  From these complaints, Williams "winnowed those complaints down further" based on testimony by Ford's representative, Mark Taylor, identifying the vehicles having a transmission with the same detent system[2] as the transmission in Muniz's F-150.  Williams further limited his consideration to only those complaints from 1990 until the date Muniz's F-150 was manufactured in January of 2001.  Williams further culled the complaints to "pick out complaints that [he] thought raised the kind of an issue that one would want to investigate further on."  Finally, Williams selected a further subset of complaints where the details of the complaint replicated what happened in Muniz's case, and Williams testified that he found six complaints within that subset.  At that point, the trial court instructed the jury that it could not consider the complaints "for any purpose that assumed that the complaints or reports are truth or that the vehicle was unreasonably dangerous or defective."  Williams then testified:

> Q.      So if I'm understanding, when Ford got the broader universe of complaints, let alone these six that are accident facts, does that require Ford to then assume that there is an issue and then do a root cause analysis?
> A.      If it's safety related, the conservative and safe way to go is assume that it's safety related, not necessarily take the allegation as totally accurate but to confirm whether or not it's accurate by doing a root cause analysis.
> ***
> Q.      So in reaching your conclusion, have you concluded from what the Ford engineers have said that the type of complaints that Ford received on this transmission, the six that are accident facts and the broader universe, that they are the type of claims that had they gone to engineering, would have — and under the ISO TS 16949 [industry-wide engineering standard], would have required that a root cause analysis be done?
> A.      That's accurate.

---

[2] The detent system involves a part that looks like a rooster comb.  A spring moves between the prongs of the comb to shift between gears.

With regard to the NTHSA complaints, Williams testified he used the same winnowing process on the complaints that were on the NHTSA website that he used with Ford's, and found six similar complaints. Williams testified that any one of the six complaints to Ford or any one of the six complaints to NHTSA should have prompted an investigation by Ford.

### 3. Waiver

As noted above, Ford made five specific objections to the admissibility of Williams's testimony regarding the customer complaints. Because the appellants have addressed only the substantial similarity complaint in their brief, they failed to preserve this issue for our review since the other unchallenged objections provided a basis for the trial court's ruling. *Collin County*, 365 S.W.3d at 877.

### 4. Substantial Similarity of 58 Complaints

"'[R]easonably similar circumstances generally means the same type of occurrence.'" *Penalver*, 2004 WL 1392268, at *3; *John Deere Co.*, 773 S.W.2d 372-73. Although the appellants' attorney attempted to elicit further testimony from Williams to establish that the 58 incidents occurred under reasonably similar conditions, the trial court did not abuse its discretion in admitting only the 12 complaints based on Williams's testimony regarding substantial similarity during the proffer. Furthermore, Williams's trial testimony made reference to the "broader universe" of complaints, and he testified that this "broader universe" of complaints would require Ford to conduct a root cause analysis. Therefore, although Williams was precluded from making reference to the number 58, it would be difficult for the appellants to establish that they were harmed by the exclusion of this number given Williams's reference to the "broader universe" of complaints. *See Tex. Dept. of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000) (noting judgment will not be reversed for erroneous rulings on admissibility of evidence when evidence is cumulative and not controlling on a material issue dispositive to the

case); *see also In re M.S.*, 115 S.W.3d 534, 538 (Tex. 2003) (noting appellant has burden to show how she was harmed by trial court's evidentiary rulings).

5.      Details of the 12 Complaints

With regard to the trial court's exclusion of the details of the 12 complaints, appellants' attorney stated that he was not seeking to admit the contents of the complaints at the conclusion of appellants' proffer.  Moreover, the trial court did not abuse its discretion in excluding the details of the twelve complaints under Rule 403.  "[P]rolonged proof of what happened in other accidents cannot be used to distract a jury's attention from what happened in the case at hand." *Nissan Motor Co., Ltd.*, 145 S.W.3d at 138.  Finally, as Ford notes in its brief, appellants did not make an offer of proof as to the contents of the complaints until it filed a Statutory Offer of Proof on March 2, 2012.  Rule 103(b) of the Texas Rules of Evidence requires an offer of proof to be made before the charge is read to the jury.  TEX. R. EVID. 103(b).  The charge was read to the jury on December 9, 2011.  Although a party may file a formal bill of exception thirty days after a notice of appeal is filed under TEX. R. APP. P. 33.2, the record does not establish that the requisite procedure required in filing a formal bill of exception was followed in this case.  *See* TEX. R. APP. P. 33.2(c).

D.      Fred King and Mark Taylor Admissions

Although appellants refer to the exclusion of admissions by both Fred King and Mark Taylor in framing their issue, the body of their brief on this issue discusses only the admissions of King that were excluded.  Specifically, the brief refers to the exclusion of King's testimony relating to two topics: (1) that he investigated over 500 park-to-reverse cases involving the post-1980 design; and (2) after an investigation of another transmission (which appellants argue was a prior model of the transmission in Muniz's F-150 – the C6 v. the 4R70/75), the number of customer complaints multiplied by more than ten.

In order for testimony regarding other lawsuits or complaints to be admissible, the appellants had the burden to show the other lawsuits and complaints involved incidents that occurred under reasonably similar conditions. *Nissan Motor Co., Ltd.*, 145 S.W.3d at 138. As previously noted, "'[r]easonably similar circumstances generally means the same type of occurrence.'" *Penalver*, 2004 WL 1392268, at *3; *John Deere Co.*, 773 S.W.2d 372-73. The only similarity shown with regard to the excluded testimony was that the incidents involved what could be a similar transmission to the transmission in Muniz's F-150. Therefore, the trial court did not abuse its discretion in excluding the testimony.[3]

E.    Exponent Video

The appellants next complain about the exclusion of a video made by Exponent, a company Ford had retained in the past, in which a Ford F-150 was placed in "false-park." The appellants contend that the video was excluded "on the grounds that 'things after the date of manufacture are irrelevant.'"

In its brief, Ford counters that the discussion regarding the videotaped test occurred in the context of a motion in limine regarding a test Exponent performed for Chrysler involving a different transmission. Ford also notes that the video was never offered as evidence and is not contained in the record through an offer of proof. Finally, Ford contends no witness was called to authenticate the video.

During the hearing on the motions in limine, appellants' attorney stated he intended to introduce into evidence a video of testing performed by Exponent. The attorney stated that Exponent had performed lots of testing for Ford and had been paid "50 million bucks" for that

---

[3] In their reply brief, appellants contend that the testimony was admissible under Rule 801(e)(2) of the Texas Rules of Evidence as party admissions. Appellants do not provide any record citation to establish that they presented this argument to the trial judge. Even if they did, however, Rule 801(e)(2) only excludes admissions of a party opponent from the definition of hearsay. It does not address the restrictions applicable to the admissibility of evidence of similar accidents as discussed in *Nissan Motor Co., Ltd.*

testing. The attorney further stated the video showed Exponent testing a Ford F-150, and the person running the test was able to place the vehicle "into false park and have a delayed engagement." The video also showed a test on a Volvo which had the same detent transmission design with a rooster comb but used a stronger spring. The person running the test was unable to place the Volvo in false park. Appellants' attorney argued that the video was relevant to demonstrate one of the alternative designs proposed by Rosenbluth (the use of a stronger spring) was in use and prevented a shift into false park.

Ford's attorney responded that the Volvo in the video was a 2003 model, and the F-150 was a 2004 model which was redesigned. Ford's attorney argued that because those models postdated the date Muniz's 2001 F-150 was manufactured, the video should be excluded. Moreover, Exponent was retained by Chrysler to perform the test.

The trial court granted the motion in limine, stating, "We're not going to talk about stuff that wasn't in existence and being used in 2001." Appellants' attorney asked if the ruling would be changed if they laid the foundation that the transmission in the 2004 F-150 was the same model. The trial judge responded, "Based on my reading of the case law, things that happened after the manufacture of the vehicle in question are not relevant to show a product liability defect. You show me something different then I'll reconsider my—." Appellants' attorney stated that he would "approach when we get there, Your Honor, because I think that relates to other similar incidents for purpose of notice."

Appellants' brief does not contain any record citation establishing where the trial court was asked to reconsider its ruling on the admissibility of the video during trial. We did locate a reference to the video by appellants' attorney toward the end of the proffer of Rosenbluth's excluded testimony. Rosenbluth testified that he would have used the video of the 2004 F-150 being placed into false park "as a basis for [his] opinion." Rosenbluth testified that the

transmission in the 2004 F-150 was identical to the transmission in Muniz's 2001 F-150. At the conclusion of the proffer, which involved various categories of testimony, appellants' attorney asked if the trial court was "standing by its ruling." The trial court stated that it was.

When the video was described during the motion in limine, appellants' attorney argued that the video showing the testing of both the 2004 F-150 and the 2003 Volvo was relevant to demonstrate one of the alternative designs proposed by Rosenbluth was in use and prevented a shift into false park. In the proffer, however, appellants' attorney only made reference to the testing of the 2004 F-150 to show Muniz's truck could be placed in false-park. Therefore, the record is unclear whether appellants sought to have the video admitted into evidence to prove a defect or an alternative design. Moreover, the "ruling" the trial court was standing by was a ruling on a motion in limine which does not preserve the issue for appeal. *See Dallas County v. Crestview Corners Car Wash*, 370 S.W.3d 25, 40 n. 9 (Tex. App.—Dallas 2012, pet. denied); *Huckaby*, 20 S.W.3d at 203. Finally, the "ruling" related to the admissibility of the video comparing the testing of the 2004 F-150 with a 2003 Volvo. Even accepting the 2004 F-150 had the same transmission as Muniz's F-150, there was no showing that the technology used in the transmission in the 2003 Volvo existed in 2001. "Whether a product was defective must be judged against the technological context existing at the time of its manufacture." *Nissan Motor Co., Ltd.*, 145 S.W.3d at 139.

F.     NHTSA Investigations and Preliminary Evaluation

Ford addresses two NHTSA investigations and one NHTSA preliminary evaluation in its brief. Specifically, Ford discusses: (1) NHTSA's C8-02 investigation on 1970-1979 Ford vehicles; (2) NHTSA's E-17 investigation on Chrysler 2003-05 trucks; and (3) NHTSA Preliminary Evaluation 09-020 on 2002-05 Ford Explorers. Appellants' brief only references the

NHTSA C8-02 in a footnote of their brief[4] and addresses the E-17 investigation[5] in a multifarious argument regarding the exclusion of evidence regarding the feasibility of an out-of-park alarm as an alternative design. Appellants do not make any effort to describe the content of these investigations, the objections made during trial, and the basis for the trial court's rulings. Accordingly, any complaint regarding the exclusion of this evidence has not been properly presented for our review. *See* TEX. R. APP. P. 38.1(i) ("brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

With regard to NHTSA's preliminary evaluation of the 2003-2005 Ford Explorers, the evidence of this preliminary evaluation is contained in a document entitled ODI Resume prepared by NHTSA. The preliminary evaluation was opened on April 21, 2009, and involved 2002-2005 Ford Explorers and Mercury Mountaineers. The evaluation was opened after 11 complaints were received from consumers alleging "unintended vehicle movement after the transmission is shifted to park." "Eight of the complainants allege a crash occurred as a result of the rollaway incident. Four complainants allege injuries after being struck by the vehicle during the rollaway incident." In addition to the eleven complaints, the preliminary evaluation also was based on 61 responses to vehicle owner questionnaires in which the consumers alleged "failure of gear shift lever mechanism while shifting from or to the park position." The ODI Resume stated, "A Preliminary Evaluation has been opened to assess the scope, frequency and potential

---

[4] We note that Ford raised the following objections to the C8-02 investigation: (1) the C8-02 investigation did not involve the alleged defect at issue in the Muniz litigation and, therefore, was not relevant; (2) the C8-02 investigation would confuse the issues, mislead the jury, and unfairly prejudice Ford; (3) the C8-02 investigation report is hearsay; (4) evidence concerning the settlement of the C8-02 investigation, which occurred almost 30 years prior to the lawsuit, was not relevant or any relevance was outweighed by dangers of undue prejudice, confusing of the issues, and misleading the jury. The only statement regarding the C8-02 investigation the appellants make in the footnote to their brief is that the admission of the C8-02 investigation would prove Ford was on notice of a need to test its vehicles.

[5] We note that the trial court allowed appellants' attorney to cross-examine one of Ford's experts regarding the E-17 investigation and NHTSA's approval of an out-of-park alarm in response to the park-to-reverse issues in the Chrysler trucks which were the subject of that investigation.

safety consequences of the alleged defect and any relationship of the alleged gearshift lever mechanism failures to the alleged vehicle rollaway incidents."

Appellants' attorney stated that Rosenbluth would testify that the transmission in the vehicles involved was substantially the same as the transmission in Muniz's 2001 Ford F-150. In response, Ford's attorney stated that the vehicles were later models and were equipped "with a 5R-55 transmission, which is a five speed rear wheel drive that handles 55 kilo newtons worth of torque. [Muniz's transmission] is a 4R-75, a four speed rear wheel drive transmission with a high torque rating that was used with different engines." Ford's attorney further noted that the vehicles involved in the preliminary evaluation "had a different steering column, totally different design from the one in [Muniz's] vehicle." Appellants' attorney acknowledged the transmissions were different but argued that both transmission systems were detent systems that operate the same way with a leaf spring or rooster comb. Ford's attorney then responded that he could represent to the court that the denting system is "substantially dissimilar." "You have a five speed transmission. You're going to have more detents there. The park engage system on the 5R-55 is totally different. … And to say that because Ford still uses a detenting system in a 5R-55 makes it substantially similar to a 4R-75 four speed transmission, you might was well say that all cars are substantially similar because they've all got four wheels." Appellants' attorney further argued that the transmissions use "a substantially similar spring pressure" and a substantially similar rooster comb. Ford's attorney responded, "it's just going to be so misleading to the jury and confusing to the jury to get in all sorts of different transmissions." After this discussion, the trial court ruled the document was inadmissible.

During the subsequent proffer, Rosenbluth testified that the function and detent system on the vehicles involved in the preliminary evaluation was substantially similar to the detent system on Muniz's vehicle. Rosenbluth also admitted, however, that the incidents described in

the complaints were rollaway incidents unlike Muniz's incident involving an empowered reverse and that Muniz's incident did not involve any failure of the gear shift lever. Finally, Ford's attorney stated that the docket for the preliminary evaluation showed that the investigation related "to the brake shift interlock solenoid interference with a swing arm on a steering column that is different from — it's made by a different manufacturer, [and] incorporates a different design than the one in this vehicle."

In their brief, appellants address the vehicles being 2002 to 2005 as opposed to 2001 and whether the transmission was substantially similar. This does not address the Rule 403 objection that Ford also made to the admissibility of the preliminary evaluation or the problem with the preliminary evaluation also being based on 61 complaints regarding the gear shift which was not a problem with Muniz's vehicle. Therefore, appellants' complaint is waived because the appellants fail to address all of the possible bases for the trial court's ruling. *Collin County*, 365 S.W.3d at 877.

Even if we were to address the merits of the appellants' complaint, "'[r]easonably similar circumstances generally means the same type of occurrence.'" *Penalver*, 2004 WL 1392268, at *3; *John Deere Co.*, 773 S.W.2d 372-73. In this case, the rollaway incident is different than an empowered reverse, and an alleged defect in a gear shift lever is different than an alleged defect in a transmission. Finally, appellants did not proffer only those portions of the preliminary evaluation relating to unintended vehicle movement, and we cannot know whether the preliminary evaluation would have been opened based on only those 11 complaints if not accompanied by the 61 gear shift lever failures.

G.     Rebuttal

Throughout their brief, appellants place a lot of emphasis on the need to rebut statements made by Ford's attorney regarding the absence of a recall and the small number of complaints.

Ford is correct in noting that the Texas Supreme Court addressed a similar argument in *Nissan Motor Co., Ltd.*, 145 S.W.3d at 141. In that case, the intermediate appellate court "held that Nissan waived any objection to admission of other accidents, despite its specific objection to the database as hearsay and irrelevant." *Id.* The plaintiff asserted "waiver occurred when Nissan 'opened the door' to evidence of consumer complaints by offering the reports by NHTSA and others that mentioned them as well." The Texas Supreme Court rejected this argument, stating, "Once the trial court admitted [the plaintiff's] evidence of other accidents, Nissan could offer similar evidence in rebuttal without waiver." *Id.* Similarly, Ford could respond to the evidence the trial court admitted by arguing about the weight the jury should place on the evidence and its relevance.

In addition, the general rule regarding testimony becoming admissible based on rebuttal appears to relate to evidence initially excluded based on relevance. "'[T]estimony which is inadmissible in the first instance *may* become relevant and admissible in rebuttal.'" *Waldrep v. Tex. Employers Ins. Ass'n*, 21 S.W.3d 692, 706 (Tex. App.—Austin 2000, pet. denied) (quoting *Johnson v. Hermann Hosp.*, 659 S.W.2d 124, 126 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.)). In this case, relevance is not the only grounds on which the evidence in question was excluded. Moreover, "the alleged rebuttal evidence must be in fact offered to *rebut* other evidence, not as part of the proponent's case-in-chief." *Id.* In many instances, the evidence was sought to be offered as part of the appellants' case-in-chief or the rebuttal arguments made by appellants were in response to argument not evidence.

### OUT-OF-PARK ALARM AS AN ALTERNATIVE DESIGN

In this single issue, appellants briefly argue that the trial court erroneously excluded: (1) evidence that Ford responded to the C8-02 NHTSA investigation by considering whether to install an out-of-park alarm to remedy park-to-reverse problems; (2) the NHTSA Preliminary

Evaluation of the 2002-2005 Dodge trucks; (3) evidence that Ford used an out-of-park alarm outside the U.S. prior to 2001; and (4) King's testimony that an out-of-park alarm design was in fact available and existing.  The appellants also argue that the trial court erred in limiting the questioning of Rosenbluth to two generic questions about: (1) whether an alarm was economically and technologically feasible in 2001; and (2) whether an alarm has been used since that time.  An issue that embraces more than one specific ground of error or attacks several distinct and separate rulings of the court is a multifarious issue which this court may disregard. *See Hollifield v. Hollifield*, 925 S.W.2d 153, 155 (Tex. App.—Austin 1996, no writ); *Clancy v. Zale Corp.*, 705 S.W.2d 820, 823 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).  In addition to attacking several distinct and separate rulings of the trial court in this single issue, the appellants complain that the trial court erred in excluding several categories of evidence without analyzing the objections made to the evidence or the bases upon which the trial court excluded the evidence.  Accordingly, we disregard this issue.  *See Hollifield*, 925 S.W.2d at 155.

### FORD'S EXPERTS

Appellants next complain the trial court erred in admitting the testimony of three experts: Mauldin, Taylor, and Dorris.

A.     Standard of Review

"The trial court must act as an evidentiary gatekeeper to exclude irrelevant and unreliable expert evidence."  *Enbridge Pipelines (East Tex.) L.P. v. Avinger Timber, L.L.C.*, 386 S.W.3d 256, 262 (Tex. 2012).  "It has broad discretion with respect to this function."  *Id*.  In determining whether the trial court abused its discretion in admitting expert testimony, "we look to see whether the trial court acted without reference to guiding principles or rules."  *Id*.

"An expert's testimony must be relevant to the issues and based upon a reliable foundation."  *Id*.  "Expert testimony is unreliable if there is too great an analytical gap between

the data the expert relies upon and the opinion offered." *Id*. (internal quotations omitted). Expert testimony also is unreliable if it is based upon subjective belief or unsupported speculation. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 239 (Tex. 2010). "Reliability may be demonstrated by the connection of the expert's testimony to the underlying facts and data in the case." *Id*.

B.      Expert Testimony Regarding Ford's Theory

Ford correctly notes in its brief that Mauldin was not called to testify as a witness at trial; however, the crux of the issue presented by appellants is the absence of actual facts to support Ford's theory that Muniz's truck was placed in reverse sufficiently close to the curb cut which kept the vehicle in place until she dislodged it in attempting to re-enter the truck. Ford argues that it was not required to present a theory because the appellants had the burden of proof, but the argument is that testimony regarding Ford's theory should have been excluded because it was not based on actual facts but was based on pure speculation.

Two witnesses to the accident testified at trial. Muniz's granddaughter, Coleen, testified that Muniz did not park her truck close to the curb, and the tires of the truck were not against the curb. Ford's attorney, however, extensively cross-examined Coleen with a diagram of the accident scene drawn during her deposition, showing the truck's front wheel wells close to the curb. Although Coleen clarified her testimony at trial and was emphatic that Muniz did not park close to the curb, Coleen's deposition testimony, coupled with the testimony of Muniz's son, Jose, that Muniz could have grabbed the steering wheel to pull herself back into the truck, provided a factual basis upon which Ford could base its theory.

Mauldin later performed tests at the accident scene to demonstrate how Muniz's truck could have remained stationary on the curb until the wheel was turned, and Taylor testified about the testing based on his review of the videotape of the testing. *See* TEX. R. EVID. 703 ("The facts

or data in a particular case upon which an expert bases an opinion or inference may be those perceived by, reviewed by, or made known to the expert at or before the hearing."). Although the appellants' attorney made many objections to Taylor's testimony regarding the video, the following exchange occurred immediately after the trial court sustained an objection to the showing of Mauldin's videotape to the jury:

> Q.    In the video tape does it show the vehicle remaining stationary on the curb until the steering wheel is turned?
>
> A.    It does.
>
> MR. NEALEY:  Your Honor, I'm going to object to a description of something much like reading from a document.  The witness can say what he thinks is possible but he shouldn't be describing what purportedly happens in the video tape.  They're not going to bring Mr. Maudlin here so we shouldn't be talking about the contents, Your Honor.
>
> MR. BIBB:  I'll move on to the next question.

As the record demonstrates, appellants' attorney did not obtain a ruling on his objection, and the jury could consider this testimony.

Therefore, the trial court did not abuse its discretion in admitting Taylor's testimony because (1) Coleen's deposition testimony provides a basis in fact to support Ford's theory that Muniz parked her truck sufficiently close to the curb cut so that it remained stationary even while in reverse; and (2) Taylor could rely on Mauldin's testing in presenting this theory to the jury.

## C.    Testimony of Nathan Dorris

The appellants contend Dorris had no independent basis for his testimony because he relied heavily on articles he did not author, which were litigation studies funded by Chrysler and others.  The appellants cite no authority to support this contention; accordingly, this complaint is waived.  *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.) ("Our appellate rules require an appellant's brief to contain a clear and concise argument for the contentions

made with appropriate citations to authorities and the record. We have no duty to brief appellant's issue for her. Failure to cite applicable authority or provide substantive analysis waives an issue on appeal.").

D.     Excluded Evidence of Bias

The appellants next contend that the trial court erred in excluding evidence of gross payments made in various cases over a ten year span to: (1) Exponent – the company which employed some of the authors of the studies relied upon by Dorris; and (2) Carr Engineering — the company owned by Mauldin.

Ford responds that the law cited by the appellants only supports cross-examination based on the witness's own bias, not the potential bias of others. Ford asserts neither Taylor nor Dorris had any personal knowledge of what Ford had paid the two entities in question, and the appellants' proof consisted of interrogatory answers in other cases. Ford notes that the trial court did allow Dorris to be cross-examined regarding the gross payments Ford had made to his company over the past ten years and regarding Chrysler's funding of the studies he referenced in his testimony.

Rule 613(b) of the Texas Rules of Evidence permits a witness to be impeached "by proof of circumstances or statements showing bias or interest *on the part of such witness*." TEX. R. EVID. 613(b) (emphasis added). Rule 602 requires a witness to testify based on personal knowledge. TEX. R. EVID. 602. We hold that the trial court did not abuse its discretion in refusing to allow the witnesses to be impeached by proof: (1) showing a bias or interest on the part of some other witness or information source; and (2) about which the witness had no personal knowledge.

## EMT TESTIMONY

The appellants assert the trial court erred in allowing testimony from two EMTs that a family member told them that Muniz grabbed the gear shift. One EMT further stated that he was told that Muniz pulled the truck into reverse when she grabbed the gear shift. Ford responds that the testimony was only admitted through one EMT mentioned in the brief,[6] the testimony was cumulative of other evidence, and that all of the experts agreed that Muniz could not have pulled her vehicle out of park by grabbing the gear shift.

"The general rule is error in the admission of testimony is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection." *Volkswagen of America, Inc.*, 159 S.W.3d at 907. In this case, Sergeant Christopher Andrews, one of the officers who investigated the accident, testified that the police report stated that Muniz accidently pulled the gear shift lever shifting the vehicle out of park. Because Sergeant Andrews's testimony was the same as the testimony about which the appellants complain and was admitted into evidence without objection, any error in admitting the other testimony was harmless.[7] *See id.*

## POWERPOINT

Appellants contend the trial court erred in denying their request for a copy of the PowerPoint that Ford's attorney showed to the jury during opening argument. Appellants cite no authority to support this issue; therefore, it is waived. *See* TEX. R. APP. P. 38.1(h); *Huey*, 200 S.W.3d at 854 ("Our appellate rules require an appellant's brief to contain a clear and concise argument for the contentions made with appropriate citations to authorities and the record. We

---

[6] The appellants appear to concede this by limiting their argument to one EMT in their reply brief.

[7] We note that every witness asked about this possibility testified that Muniz could not have pulled the truck into gear because the truck was equipped with a brake shift interlock which required the brake to be engaged to move the gear from park to reverse. Although the appellants contend Ford's attorney referred to the testimony of Muniz pulling the truck into reverse in closing argument, Ford's attorney referred to Muniz grabbing the gear shift only as a manner in which the truck could have been dislodged from the curb cut, not as a means to shift it into reverse.

have no duty to brief appellant's issue for her. Failure to cite applicable authority or provide substantive analysis waives an issue on appeal.").

## CLOSING ARGUMENT

Appellants assert the trial court erred in failing to regulate Ford's conduct during closing argument, contending Ford's attorney "issued a number of improper ad hominen attacks," including: (1) insinuating that "Plaintiffs' counsel's cross examination was dishonest;" (2) telling the jury that plaintiffs' counsel "had improperly impugned the honor of Ford's lawyer who was an honorable military veteran;" and (3) insinuating that plaintiffs' counsel tampered with evidence. Ford responds that the complaint is not preserved, its argument was within the bounds of proper argument, and Ford's argument "pales in comparison" to the argument made by appellants' attorney.

"Appellate complaints of improper jury argument must ordinarily be preserved by timely objection and request for an instruction that the jury disregard the improper remark." *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). "A complaint of incurable argument may be asserted and preserved in a motion for new trial, even without a complaint and ruling during the trial." *Id.* "Incurable jury argument is rare." *Id.* Typically, any probable harm can be cured by retraction of the argument or instruction from the court. *Id.* "The party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was so extreme that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument." *Id.* (internal quotations omitted).

In this case, appellants' attorney made only one objection during closing argument to Ford's argument that plaintiffs' counsel "goes on the attack with Mr. Ramirez" who "unbeknownst to counsel, is a veteran of the U.S. Marine Corps who served our country in the

Iraq war." The trial court sustained the objection, but appellants' attorney did not request an instruction to disregard. Accordingly, this complaint is not preserved for our review. *See id.*

With regard to appellants' contention that Ford insinuated that Plaintiffs' counsel's cross examination was dishonest, Ford's attorney stated, "[Taylor] is one of the engineers and he talked to you at great length about how he started out and Mr. Nealey went on and on with him on cross examination, not very ineffective [sic] in my mind, but that notwithstanding, he kept going on and Mr. Taylor tells you, look, we carefully design." With regard to appellants' contention that Ford insinuated that plaintiffs' counsel tampered with evidence, Ford's attorney stated, "But I always am most interested in what happens and what is said and what the evidence is before lawyers get involved. You know, it is — it is a shame sometimes in this society when lawyers get involve[d], things get complicated. You have all these wild theories and different interpretations." Ford's attorney further stated, "… 19 days later on August 8th we get the first indication, 'Mom pulled up to the gate in her truck.' So on the day of the incident Officer Miller says, 'they told me it was parallel.' And then 19 days later after who knows who gets involved, it changes and it is 'well, she pulled up to her gate.'"

We hold that none of the foregoing rises to the level of incurable jury argument. With regard to Taylor, Ford's attorney was discounting the attempt to discredit Taylor's testimony during cross examination, and Ford's attorney even misspoke and said the cross examination was "not every ineffective." With regard to the alleged tampering of the evidence, the argument pointed out inconsistencies in the evidence and placed blame on all lawyers, not just appellants' attorneys.

### JURY CHARGE

With regard to the jury charge, appellants contend the trial court erred in requiring them to choose between a strict liability defect question and a negligent design defect question.

Although a trial court must submit in its charge to the jury all questions raised by the pleadings and evidence, a single question may relate to multiple legal theories. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663-64 (Tex. 1999). "Indeed, submission of a single question relating to multiple theories may be necessary to avoid the risk that the jury will become confused and answer questions inconsistently." *Id*. at 664. The trial judge exercises broad discretion in submitting a charge to the jury so long as the charge is legally correct. *Id*.

In *Hyundai*, the Texas Supreme Court held that "when claims for breach of an implied warranty and strict liability are both predicated on the dangerousness of a product's design," the trial court does not abuse its discretion in refusing to "ask the jury to make essentially the same factual determination separately for each legal theory. *Id*. at 662. The court noted, "Liability for personal injuries caused by a product's defective design can be imposed under several legal theories, among them negligence, breach of warranty, and strict products liability." *Id*. at 664. Where the controlling issues regarding the existence of a defect for two legal theories are functionally identical, the trial court is not required to submit separate questions on each legal theory. *Id*. at 665. The controlling issues are functionally identical when the theories stem from a single complaint — the occupant of a vehicle would not have sustained injuries but for the product defect. *Id*. Under those circumstances, a trial court can properly refuse to submit separate questions as to each legal theory to avoid confusing the jury and the possibility of inconsistent findings. *Id*.

Although *Hyundai* addressed the theories of breach of implied warranty and strict liability, the same analysis applies where the theories are negligence and strict liability where the concept of defect is functionally identical and the resolution of the defect issue involves identical factual determinations. *Ford Motor Co. v. Miles*, 141 S.W.3d 309, 315 (Tex. App.—Dallas 2004, pet. denied). "Although a negligence claim requires a different showing from a strict

liability claim, it is not logical for a manufacturer to be held liable for failing to exercise ordinary care when producing a product that is not defective because: (1) if a product is not unreasonably dangerous because of the way it was manufactured, it was not negligent to manufacture it that way; and (2) even if the manufacturer was somehow negligent in the design or production of the product, that negligence cannot have caused the plaintiff's injury because the negligence did not render the product 'unreasonably dangerous.'" *Id*.

In this case, the appellees' requested negligence instruction contained a definition of "design defect" that was identical to the definition contained in the strict liability question. If the jury had answered "yes" to strict liability and "no" to negligence, the answers would be in fatal conflict. *Id*. at 319. Absent a defect, Ford could not have been negligent in failing to investigate the alleged defect. Accordingly, "to avoid confusing the jury and the possibility of inconsistent findings," the trial court did not abuse its discretion in refusing to submit separate questions on each theory. *Hyundai Motor Co.*, 995 S.W.2d at 665.

## COSTS

Appellants' final contention is that the trial court erred in awarding Ford $14,958.87 in costs. Appellants contend the award included: (1) charges to copy Williams's entire file which was over 10,000 pages at a cost of $3,501.25; (2) charges to copy Rosenbluth's file at a cost of $2,521; and (3) costs associated with depositions other than the cost of the actual transcripts, including videotaping, rental of conference rooms, digitizing exhibits, and electronic transcripts. Ford responds that the costs included only recoverable costs for: (1) the cost of the original transcript and exhibits; and (2) cost for trial transcripts of testimony for use during the trial.

At the conclusion of a hearing regarding the awarding of costs, the trial court ruled as follows:

THE COURT: Okay, I'm going to allow the costs for all the depositions to include exhibits. With regard to the trial transcripts, I will allow cost of the transcript. However, they're to be figured at the $6 page rate as opposed to the 10 [an expedited rate]. You can do the math for me and then I'll fill in the amount and I will award judgment as submitted with that amount.

After a brief recess for the attorneys to make the adjusted calculations, the attorney announced, "the final math is $14,958.87 on the costs."

An award of costs is reviewed on appeal under an abuse of discretion standard. *Crescendo Investments, Inc. v. Brice*, 61 S.W.3d 465, 480 (Tex. App.—San Antonio 2001, pet. denied). A trial court has the discretion to award costs for "fees of the court reporter for the original of stenographic transcripts necessarily obtained for use in the suit." TEX. CIV. PRAC. & REM. CODE ANN. § 31.007(b)(2) (West 2008). Section 31.007(b)(2) authorizes the awarding of the costs of deposition and trial testimony transcripts. *Crescendo Investments, Inc.*, 61 S.W.3d at 480-81. Furthermore, a deposition on written questions is a deposition for which costs may be recovered. *Ferry v. Sackett*, 204 S.W.3d 911, 913 (Tex. App.—Dallas 2006, no pet.). Rule 203.4 provides that the exhibits introduced during a deposition must be annexed to the deposition transcript. TEX. R. CIV. P. 203.4 Accordingly, the fees of the court reporter for the original stenographic transcript can include the costs of the exhibits annexed to the transcript. *See Allen v. Crabtree*, 936 S.W.2d 6, 8 (Tex. App.—Texarkana 1996, no pet.) (construing prior rule that specifically ordered clerk to tax both the charges for preparing the deposition transcript and the charges for attaching copies of all exhibits). Because the trial court limited Ford's recovery to costs of the depositions, including exhibits, and trial transcripts, the trial court did not abuse its discretion in awarding those costs.

## CONCLUSION

The trial court's judgment is affirmed.

Catherine Stone, Chief Justice